### BAKELITE CORPORATION v. BRUNS-WICK–BALKE–COLLENDER CO.

(District Court, D. Delaware.
August 12, 1925.)

No. 537.

**Patents ⬿328—942,699 and 942,809, for "bakelite," held not infringed.**

The Baekeland patents, No. 942,699, called the heat and pressure patent, claims 1, 2, and 4, for process, and No. 942,809, called the base patent, claims 1, 5, 6, 7, and 8, for process and product, both patents relating to method of making insoluble and infusible condensation products of phenol and formaldehyde, construed in the light of the prior art, *held* not infringed in manufacture of billiard balls.

In Equity. Suit by the Bakelite Corporation against the Brunswick-Balke-Collender Company. Decree for defendant.

Charles Neave and Maxwell Barus, both of New York City, for plaintiff.
William H. Davis, Frank E. Barrows, and John F. Neary, all of New York City, for defendant.

MORRIS, District Judge. The Brunswick-Balke-Collender Company, defendant herein, manufactures billiard balls. The ingredients of the balls consist of a binder and filler. With the filler we are but little concerned. The binder, however, is a phenolic condensation product—a condensed or dehydrated product resulting from the reaction of phenol and formaldehyde upon each other—and Bakelite Corporation, the plaintiff, alleges that, in the manufacture of balls containing that binder, the defendant employs the process of claims Nos. 1, 2, and 4 of plaintiff's patent, No. 942,699, "for improvements in methods of making insoluble condensation products of phenol and formaldehyde" and the process of claims Nos. 1, 5, and 6 of plaintiff's patent No. 942,809 and, as well, that the finished ball is the product called for by product claims Nos. 7 and 8 of the latter patent which is for an "improved method of reacting with formaldehyde upon phenol or a phenolic body, and the improved product resulting from such reaction." The defenses are noninfringement, in that the defendant has kept wholly within the prior art and that, consequently, if and so far as plaintiff's claims embrace defendant's process or product, they are invalid because of the prior art.

The former of these patents, No. 942,699, known as the "heat and pressure" patent, was granted December 7, 1909, upon an application filed July 3, 1907. With respect to the process of this patent, the patentee, Dr. Leo H. Baekeland, at page 1, lines 29-37, says: "In practicing the invention, I react upon a phenolic body with formaldehyde to obtain a reaction product which is capable of transformation by heat into an insoluble and infusible body, and then convert this reaction product, either alone or compounded with a suitable filling material, into such insoluble and infusible body by the combined action of heat and pressure."

Claim 1 may be considered typical of the claims of this patent in suit. It is: "1. The method of producing a hard, compact, insol-

uble, and infusible condensation product of phenols and formaldehyde, which consists in reacting upon a phenolic body with formaldehyde, and then converting the product into a hard, insoluble, and infusible body by the combined action of heat and pressure."

Patent No. 942,809, known as the "base" or "base-condensing agent" patent, was granted December 7, 1909, to Dr. Leo H. Baekeland upon an application filed October. 15, 1907. It states that condensation products had been prepared by simple boiling or heating of phenol and formaldehyde, but that the reaction proceeds very slowly unless to the mixture of the two there is added a third ingredient—a catalytic or condensing agent—to facilitate and expedite the reaction (page 1, lines 18–26); that acids and salts (page 1, lines 29, 30), and large amounts of bases such as caustic soda, with subsequent neutralization by means of acid, had been used as condensing agents (page 2, line 127, to page 3, line 5); that, if large amounts of caustic soda are used, alkaline derivates of phenol-alcohol are obtained (page 1, lines 104–107); and that the proportion of bases used as condensing agents has a preponderant influence on the nature of the ultimate products (page 1, lines 95–98). With respect to his achievements, covered by this patent, the patentee says (page 1, lines 38–46): "I have discovered that the addition in proper proportions of an organic or inorganic base to a mixture of phenol and formaldehyde, or to either component of the mixture, facilitates the reaction and yields products which are commercially far superior to those obtained by simple heating or by the use of acids or salts as condensing agents." By the claims the proportion or amount of base is fixed at not exceeding one-fifth of the equimolecular proportion of phenolic body employed. Claims typical of the method and product claims in suit of this patent are Nos. 1 and 8, respectively, which read thus:

"1. The method which consists in reacting on a phenolic body with formaldehyde in presence of a base serving as a condensing agent, the proportion of base in the product being less than one-fifth of the equimolecular proportion of the phenolic body used."

"8. The herein described condensation product resulting from the reaction of a phenolic body and formaldehyde in presence of a basic condensing agent, said condensation product characterized by its hardness, its insolubility in water and all known solvents, by its infusibility or resistance to heat, and by the presence therein of a proportion of free or combined base not exceeding one-fifth of the equimolecular proportion of phenolic body employed."

The defendant's process consists of several steps. To a mixture of equal portions of phenol and commercial (40 per cent.) formaldehyde it adds a base (caustic soda) in an amount equal to about 70 per cent. of the equimolecular proportion of the phenolic body used. The mixture is allowed to stand for some time. A measured quantity of the mixture is then put in a flask. The flask containing the desired quantity of the mixture is connected with a reflux condenser. The contents of the flask are heated to the boiling point, acquiring a reddish brown color, and are then poured into a bowl. Immediately the operator begins adding hydrochloric acid and stirring the mixture vigorously. This is continued until the mixture begins to separate into two liquids. One of these liquids is an aqueous solution, sometimes called "mother liquor," and consists of the free water in the phenol and formaldehyde solution and also of the water which constitutes one of the products of the reaction. The second or remaining liquid is the other product of the reaction—the condensation product in its initial form. It is light brown in color and oily or viscous in character. The beginning of the separation of the two liquids is evidenced 'by the appearance of drops of the oily liquid upon the surface of the then milky, opaque contents of the bowl. Thereafter the addition of hydrochloric acid and the stirring are cautiously continued until the separation of the contents is practically complete and the condensation product, now almost entirely at the surface, is caused to boil and bubble by the heat generated by the reaction. The reaction, shown by the boiling to have proceeded far enough, is then checked by the addition of water. The mother liquor soon rises to the top and is poured off. The condensation product, then a hot, white, or creamy semiplastic mass, remains. The filler is added and intermixed, and the whole made into a small "pat." The pats remain overnight in the room in which they are made, and are then put into a drying room having a temperature of 160°–200° F., where they stay for 36 hours. After being in the drying room 8 hours, they are coarsely ground. Fourteen hours later the coarsely ground material is reground. At the end of the remaining period of fourteen hours in the drying room the dried material is put into molds and heated, under pressure of

3,500–4,000 pounds per square inch, for 45 minutes at a temperature of about 300° F. in a preforming press. Upon the removal of the balls from the molds they are again subjected to heat and pressure—gunning—of 3,600–4,000 pounds per square inch for 35 minutes at a temperature of 340° F. in the Hyatt hydraulic gun described in Hyatt patent, No. 239,791, of 1881.

The defendant points out that in its practice it uses much more than the amount of base to which the "base" patent in suit is limited; that such use is "followed by neutralization and then by acid condensation, as in the prior art disclaimed by Baekeland"; and urges that consequently neither its process nor its product is within the scope of the claims of the "base" patent. The plaintiff, however, contends that, though the defendant starts its reaction with an amount of base in excess of the amount called for by the claims of the "base" patent in suit, yet the excess is removed at an early stage of the reaction by acid; that, contrary to defendant's contention, the acid added neither acidifies nor neutralizes the condensation product; that an amount of base within the proportions of the base patent remains therein; and that the initial use by the defendant of an amount of base in excess of the proportion specified in plaintiff's claims in suit and its subsequent neutralization by acid of such excess is the same in its operation and effect as if plaintiff's specified proportion of base were used from the beginning. Thereby, as I understand the matter, two fundamental issues are raised under the base patent—(1) a question of fact, whether the defendant by the addition of acid does acidify or at least neutralize its condensation product, and, if not, (2) whether the initial use by the defendant of caustic soda in an amount greatly in excess of the proportion called for by the "base" patent and the subsequent neutralization of the greater part, but not the whole, thereof takes defendant's process and product outside the scope of plaintiff's claims (A) because alkaline derivates of phenol-alcohols result from the initial use of large amounts of caustic soda and remain in defendant's product, or (B) because the amount of base left in the product (a) is so small as to be negligible and without effect, or (b) is less than the amount called for by the plaintiff's claims when read in the light of the specification, or (c) is such an amount as would in all probability be found in the final product if made under a process of the prior art and

hence not within the plaintiff's claims when construed in the light of that art.

With respect to the primary question of fact involved under this patent, it is not disputed that the proportion of base initially added by the defendant to its mixture is between 3½ to 4 times the proportion called for by the claims in suit. There is express and direct evidence that the whole of the base employed is completely neutralized and the condensation product acidified by the addition of hydrochloric acid. Dr. McCormack said (X-Q. 267–269) that he had made many tests of defendant's condensation product before the filler was added but that he had found "zero alkalinity in every instance." Samples of the same material were analyzed by Dr. Griffin (Q. 37) with the same result. The plaintiff, to whom like samples were delivered during the trial, presented no contrary evidence with respect thereto. Dr. Norris (Q. 17) testified that, after the solution in the bowl had shown a strong acid reaction to litmus paper, some acid was added, and that at the end the solution was strongly acid. There is no direct evidence in conflict with this testimony of Dr. McCormack and Dr. Norris.

The plaintiff, however, seeks by circumstantial evidence to refute this testimony and to establish that only a portion of the base is neutralized and that there remains throughout defendant's process and in its final product an amount of base within the proportions specified in the plaintiff's claims. The evidence so relied upon is that a condensation product held in solution by an alkali may be precipitated by an acid before the entire solution becomes acidified with a resultant entrapment of small portions of the alkali in the precipitate which, in the absence of thorough washing, remain therein; that defendant's filler consists in part of lithopone, whose constitutents, zinc sulphide and barium sulphate, react with hydrochloric acid to produce hydrogen sulphide with its rememberable odor, and that this filler is added to defendant's product when in a warm fluid or semiplastic state, without the odor of hydrogen sulphide having been observed at any time by any one; and that analyses by water extraction of defendant's powder mixed with the filler and ready for pressing and of its finished balls showed the presence therein of a base within the proportions specified in plaintiff's claims. I think such evidence, however, cannot outweigh the affirmative evidence of Dr. McCormack and Dr. Norris. It is true that de-

fendant's witness, Dr. Pond (Q. 55) testified, in effect, that in carrying out the process of neutralizing the base by acid to obtain a resinified condensation product there may be left, sometimes, in the product a trace of alkali such as a few hundredths of one per cent. It is likewise true that Dr. Baekeland indicated the strong probability of the existence of a residue of base in the product unless it is subjected to thorough washing. But Dr. McCormack and Dr. Norris are chemists of skill. They rank high indeed in their profession, and are no ordinary witnesses. They testified as a fact that the addition of acid by the defendant does not stop with neutralization but is continued until the solution is strongly acid. This testimony is corroborated by the testimony of Dr. McCormack and Dr. Griffin that analyses of defendant's condensation product, before mixing with the filler, show zero alkalinity. Plaintiff's hydrogen sulphide theory is likewise, I think, without much strength.

In view of the fact that zinc sulphide and barium sulphate constitute only a portion of defendant's filler, and that, however strongly acidified defendant's condensation product may be, the acid constitutes only a small portion indeed thereof, and, in view of the further fact that the condensation product at the time of the addition of the filler is in a thickly fluid or semiplastic state and the odors of phenol and formaldehyde are then strong, I think there is a probability that hydrogen sulphide is not formed by the addition of the filler, and that, if it is, it is in such very small quantities that its odor is not sufficient to be observed in the presence of the great preponderance in volume of the odorous gases and vapors of phenol and formaldehyde. With respect to the presence of a base in defendant's powder mixed with filler ready for pressing and in its finished balls, the evidence is that analyses, by water extraction, of such products of defendant, showed the presence therein of a base in quantities ranging as high as .08 per cent. by weight of the ball or about .16 per cent. if measured by weight of the binder.

While I have not failed to observe that the limitation both of the process and the product claims as to proportion does not relate to the proportion of base used in the process but to that contained in the product, yet I do not understand that the plaintiff does or can seriously contend that the claims of its patent are broad enough to embrace an ultimate product whose constituents are a mixture of a condensation product, made by mixing and molding an infusible and insoluble condensation product containing no base, and a filler which contains a base. Whether the amount of base found in defendant's mixed filler and binder and in its balls came from the filler or the binder or was the product of a chemical reaction, taking place during the extraction test, between the extractable contents of the filler and of the base, could not, of course, be shown. It follows, I take it, that the circumstantial evidence relied upon by the plaintiff fails to overcome the direct and affirmative evidence of Drs. Norris, Griffin, and McCormack that defendant's solution is acidified and that its binder, when tested alone, shows zero alkalinity. Consequently, I am compelled to resolve the primary question of fact involved in the determination of issues arising under the base patent against the plaintiff and to find that the defendant, in carrying out its process, adds to its mixture of phenol and formaldehyde an amount of base largely in excess of the proportion called for by plaintiff's claims, and that it subsequently neutralizes the whole of the base so added. This conclusion makes it unnecessary to consider whether the initial use of an amount of base in excess of the proportion of the patent in and of itself takes defendant outside of plaintiff's claims. For the same reason it likewise becomes unnecessary to consider whether, if the finding were otherwise, the presence in the binder of .16 of one per cent. of base would be within the scope of plaintiff's claims when interpreted in the light of the specification and the prior art.

With respect to the "heat and pressure" patent, the defendant concedes that its initial, oily, viscous condensation product is soluble and fusible, that it is obtained by "reacting upon a phenolic body with formaldehyde," and that it converts its initial product into a final "hard, compact, insoluble and infusible condensation product." It contends, however, that its initial soluble and fusible product, the oily, viscous liquid, and its method of making that product, were both known to the prior art; that that product is converted into an infusible and insoluble product, not, as plaintiff asserts, by the heat and pressure of the preforming press and Hyatt gun, but before the material is charged into the molds of the preforming press; that its application of heat and pressure in the preforming press and gun is merely a molding operation, long used for plastics, in which the heat is applied to soften and make plastic and the pressure to

give form and shape; that the method by which the conversion of its soluble and fusible initial product is converted into its insoluble and infusible product consists of resinification through acidification, and then, after mixing it with filler, heating it without pressure for many hours at a temperature below 100° C.; that such method of rendering the initial, oily, viscous condensation product infusible and insoluble was also known to the prior art, is neither the method of the "heat and pressure" patent nor an equivalent thereof; and that the method of the "heat and pressure" patent, when read, as it must be, in the light of the prior art and of the representations made by the patentee to the Patent Office, in order to obtain an allowance of the patent, is restricted to the application of the combined action of heat and pressure upon material before it has been rendered insoluble and infusible; and that the advance of the patent over the prior art lay in subjecting a shaped mass of the soluble and fusible material to a temperature in excess of 100° C., to expedite the conversion and in the simultaneous application of pressure, or, more accurately, a counter pressure, as by a closed vessel, to prevent the migration and escape of gases and vapors with resulting, utility destroying porosity in the final product.

The plaintiff takes the position that before Dr. Baekeland's contributions by the patent in suit to the synthetic resin or condensation product art there was no phenolic condensation industry and, in truth, no art with respect to hard, compact, insoluble, and infusible condensation products; that the prior art condensation products were of three classes: (1) Those that were permanently soluble and fusible (that is, those capable of being rendered fluid by heat and solid by cooling again and again without their becoming insoluble and infusible); (2) those that were hard, insoluble, and infusible but useless because expanded and porous through inability to control the reaction; and (3) those that were not infusible and insoluble, yet were not sufficiently soluble and fusible to be useful in the arts. As to these three prior art products, the plaintiff says that those of the first class, called by Dr. Baekeland "Novolaks," have properties in common with some of the natural resins such as shellac and amber and rosin, which also are permanently fusible and soluble, were made to serve, more or less successfully, as shellac or resin substitutes, and are the true synthetic resins, although that name is not always restricted to products of this class and is sometimes used synonymously with condensation products; that the products of the second class remained wholly undeveloped for want of a method by which their utility destroying qualities could be eliminated, as did also those of the third class, called by Baekeland "nondescripts," because the products of that class had characteristics which made them unsuited for use either as a soluble or as an insoluble product.

The plaintiff asserts that Dr. Baekeland produced a fourth class, called by him "resinoids," and that he disclosed in the "heat and pressure" patent the process for their production; that the products of this class are hard, infusible, and insoluble but not expanded and porous; that they have characteristics that make them inherently and chemically different from any condensation product of the prior art; that these differences were the consequence of the combined action of heat and pressure upon a reaction product capable of transformation by heat into an insoluble and infusible body; that the action of the heat upon such initial reaction product brings about (1) condensation (the splitting off of water), and (2) polymerization (a reunion of the atoms of the condensation product in the same proportions but not in the same number) resulting in an increase of molecular weight and in an increase in the strength and hardness of the product while still hot instead of upon cooling as in the case of other resins and other plastics; that the simultaneous application of pressure prevents the migration and escape of vapors and gases engendered by the heat, and thereby forestalls, not only a disturbance of the proportions of the constituents, but also a consequent porosity and expansion of the mass; that, in carrying out the process of the "heat and pressure" patent Baekeland controls the reaction by dividing it into stages, and obtains an initial product (page 1, line 65), called "Bakelite A," an intermediate product (page 1, line 73), called "Bakelite B," and the final product (page 1, line 84), "Bakelite C." The plaintiff further asserts that Dr. Baekeland's contributions through the heat and pressure patent in suit consisted (1) in bringing under control, by dividing it into stages, the reaction which yields the resinoids or phenolic resins of the hard, infusible, insoluble type, and (2) in teaching that the final transformation from Bakelite B to Bakelite C—the polymerization— should be carried out under counter pres

to prevent loss of reagents and to obtain compactness, strength, and hardness.

With respect to defendant's process, the plaintiff contends that the defendant controls its reaction by dividing it into stages—checking the action of the acid, then proceeding by heat without pressure and completing it by the joint action of heat and pressure; that the material charged into its preforming press is a partial condensation product, Bakelite B, which, while in the press and Hyatt gun, becomes, through polymerization by heat, an insoluble and infusible body, and, by the application of the pressure of the press and gun, a strong, hard, nonporous, compact body, and that consequently the heat and pressure employed by the defendant in its preforming press and in its gun serve a purpose and produce an essential effect in addition to their molding functions, and that hence defendant's division of its reaction into stages and its use of heat and pressure which serve to produce essential chemical and physical effects and properties, as well as to mold, constitute an infringement of plaintiff's "heat and pressure" patent.

The defendant does not deny that it controls its reaction, or that it divides its reaction into stages, or that some chemical changes take place in its product while in the press and gun. It asserts, however, that Dr. Baekeland was not the first to show how to control the reaction or the first to divide it into stages; that his so-called division into stages is not in truth a real division into stages; that the product charged into the press is insoluble and infusible within the meaning of the patent; that, as admitted by Dr. Baekeland, the Bakelite C never arrives at that stage of perfection in which it is 100 per cent. insoluble and infusible; and that such chemical changes as take place in the material while in the press and gun are such changes as occur in Bakelite C, for example, when it is subjected to heat, and not such changes as occur in the transformation of Bakelite "B" to Bakelite "C." The issues, as I understand them, which under the "heat and pressure" patent arise from the facts and the positions of the parties are (1) —a question of fact—Is the material charged into defendant's preforming press infusible and insoluble within the meaning of those terms as used in the "heat and pressure" patent? and, if so, (2) whether the division of the reaction, by which it was produced, into stages is within the scope of the "heat and pressure" patent when interpreted in the light of the prior art and the rep-

resentations of the patentee made to the Patent Office during the pendency of the patent application.

Is the material charged into defendant's preforming press infusible and insoluble within the meaning of those terms as used in the "heat and pressure" patent? With respect to the meaning of "infusible" and "insoluble" as used in that patent, there seems to be no difference between the parties. Plaintiff's witnesses, Baekeland (Q. 17–21, X-Q. 118–120), Schrimpe (X-Q. 56–57), and O'Neill (X-Q. 171–174), testified that, if a substance to which sufficient heat is applied "does not liquefy, if it simply softens a little, but does not liquefy, does not melt, it is called infusible," and that a substance is infusible if it is incapable of being melted or liquefied when heated in an open dish in an oven to 140° C. or in a naphthalene vapor bath to 218° C. As to the meaning of the term "insoluble" Baekeland (X-Q. 111, 112) and Schrimpe (Q. 41) said that, if a material is put into a designated solvent and does not dissolve therein so as to produce a substantial homogeneous mass in which there are no lumps, it is insoluble, although it may swell in that solvent. Dr. Baekeland added (Q. 17) that absolutely insoluble substances do not exist and (X-Q. 118, 119), that Bakelite C may be 99 per cent., sometimes 97 per cent., sometimes 60 per cent., insoluble, and it is nevertheless the hard, insoluble, infusible Bakelite C described in the patent.

What is the result when the material charged by the defendant into its preforming press is tested by these definitions? Dr. McCormack testified (Q. 76–122), and showed by exhibits, Defendant's Nos. 5 to 13, inclusive, that the defendant's condensation product obtained by acidification alone without subsequent drying or treatment in the press and gun swells and disintegrates in alcohol and in acetone but is insoluble and infusible; that the same product, after the first drying operation, shows slight swelling in alcohol and acetone, but shows no swelling whatsoever either in alcohol or acetone after the second or after the third drying operation. These exhibits are even now in the same state and condition in which they were when put in evidence. The same product, before being subjected to any drying operation whatever, was heated for 22 minutes at 218° C. in a naphthalene bath. Its edges showed slight fusion. McCormack, Q. 115–120. After being subjected to the initial drying operation, the same test was repeated without any evidence of fusion being

apparent even on the sharp edges of the pieces. McCormack, Q. 122. In view of this result, tests after the second and third drying operations were not made. This testimony was not directly contradicted. The plaintiff points out, however, that a greater portion of phenolic condensation product may be extracted from the material charged into the press than from the finished balls, and from this fact draws the inference that during defendant's molding operation chemical changes take place in the material with a resulting generation of gases. From this, as I understand its position, it draws the conclusion that, even if defendant's material is insoluble and infusible when charged into the press, defendant's molding operation is nevertheless a chemical and counter pressure operation as well, and that it is consequently an infringement of the "heat and pressure" patent.

To this contention of the plaintiff the defendant makes two answers: The first is that its product when put into the preforming press is not only insoluble and infusible, but is, as well, without volatile constituents, and that in the instances in which inadequately dried and reacted material has been put into the press the vapors and gases have created cavities in the ball and destroyed its texture and utility. Defendant's second answer is that the process of the patent embraces the application of heat and pressure for converting the resin from the soluble and fusible to the insoluble and infusible state only, and not to such relatively slight chemical changes and evolution of gases as may take place during the molding of a product that, within the meaning of the patent, has the insolubility and infusibility of Bakelite C. In determining the sufficiency of these answers to the conclusion of the plaintiff, it must be remembered that the plaintiff admits that the so-called hard, insoluble, and infusible condensation products are never so completely reacted that some portion thereof cannot be extracted. It would seem to follow that by the application of sufficient heat, the extractable portion may always— short of charring—be made to react further. Since the heat of a molding operation would probably cause some of the unreacted or incompletely reacted materials to react further, no one would be at liberty, if plaintiff's contention be sound, to mold such products howsoever insoluble and infusible and howsoever far removed from plaintiff's process the method of the manufacture of such products might be. Again, although I understand that an evolution of gases accompanies or

is an incident of condensation, I do not understand that gases are engendered by the chemical reaction called polymerization. Hence, I take it that chemical changes, unaccompanied by a giving off of vapors and gases, may take place in the insoluble and infusible condensation products during a molding operation without the molding pressure's acting in any sense as a counter pressure. But, be this as it may, I think it sufficient, without carrying the discussion further, to say that I am of the opinion that the "heat and pressure" patent neither has nor purports to have any application to a true molding operation upon a condensation product that, within the meaning of the patent, is insoluble and infusible, and that this conclusion follows without regard to the extractable percentage of such material.

As the plaintiff makes no claim that the defendant infringes the "heat and pressure" patent otherwise than by the simultaneous application of heat and pressure to its material while in the press and gun and by the division of its reaction into stages, there remains for consideration only whether the checking by the defendant of its reaction after the addition of acid to its mixture, the pouring off of the mother liquor, and the subsequent completion of that reaction under the application of heat without pressure for a long period at low temperatures constitutes an infringement. This requires a determination, in part at least, of the scope of the claims in suit. While I have examined the publications and patents of the prior art and Dr. Backeland's comments thereon in his several papers, considered the General Bakelite Cases (D. C.) 225 F. 539, and Id. (D. C.) 276 F. 166, and read the testimony at length, I think the determination of whether or not the claims of the "heat and pressure" patent in suit embrace defendant's division of its process into stages requires little if any examination of the prior art.

Plaintiff's specific contention, as I understand it, is that the heat and pressure patent both discloses and claims a process divided into stages, and that in such division is found the method by which the reaction is controlled. That which is pointed out as the stages claimed is (1) making, or taking, the oily, viscous condensation product and (2) converting it into a final condensation product. This had been done before. De Laire took the partial condensation product of Mannasse and Lederer and converted it into a final product. But apart from that, the plaintiff, as I understand it, does not deny that the initial, oily, viscous partial con-

densation product made or used by it was old. It would seem to follow that the substance of the claims is found in the method of converting the initial product into the final and completed product. The patent does not disclose or claim a method divided into stages for accomplishing that result, unless it does so by showing (page 1, line 65) that by its method a product in varying stages of development, Bakelite A, Bakelite B, or Bakelite C, may be obtained. But, from the fact that a product may be produced in varying stages of development, it cannot be reasoned, I think, that the reaction by which it is so produced, has any true stages, particularly when, as here it appears. that the properties of the product are varied merely by discontinuing, or continuing for a longer time, the application of the heat and pressure. To me such results indicate no more than that, to produce them, the reaction is interrupted at the desired point in its advancement. Since there is no disclosure of a reaction divided into stages, it follows, of course, that there is no disclosure of a reaction controlled by being divided into stages. As the material to which the defendant makes a simultaneous application of heat and pressure has the degree of insolubility and of infusibility possessed by Bakelite C, and as the plaintiff does not divide its reaction into stages, I think the defendant does not employ the process of the "heat and pressure" patent.

For the reasons stated, I am of the opinion that the defendant does not infringe the claims in issue of either patent in suit. The bill of complaint must be dismissed.