FAIRCHILD INDUSTRIES, INC., and McDowell National Bank

v.

The UNITED STATES.

No. 273–78.

United States Court of Claims.

April 2, 1980.

Andrew J. Conner, Erie, Pa., attorney of record for plaintiff Fairchild Industries, Inc., Dunn & Conner, Erie, Pa., of counsel.

Donald R. McKay, Sharon, Pa., attorney of record for plaintiff McDowell National Bank, Cusick, Madden, Joyce & McKay, Sharon, Pa., of counsel.

Ray Goddard, Washington, D. C., with whom was Asst. Atty. Gen. Alice Daniel, Washington, D. C., for defendant.

Before SKELTON, Senior Judge, and KASHIWA and BENNETT, Judges.

## ON PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND DEFENDANT'S CROSS–MOTION FOR SUMMARY JUDGMENT

SKELTON, Senior Judge:

This suit involves the proceeds from the assignment of three government contracts. The original plaintiff in this action, Fairchild Industries, Inc., a subcontractor of the assignor, Aeroking, Inc., and the McDowell National Bank, the assignee and intervenor, seek payment of the proceeds of these contracts which they claim they never received from the Government. The record shows that the Department of the Air Force entered into these contracts with Aeroking, Inc. supplied parts to Aeroking which Aeroking used in its performance of these contracts.[1] On February 4, 1974, Aeroking executed a written assignment of the proceeds of each of these three contracts to the McDowell National Bank in Mercer, Pa. Immediately thereafter, the Government was notified by Aeroking of these assignments (and furnished copies thereof) with "Notice of Assignment" forms on copies of which the Government acknowledged their receipt in writing. On July 10, 1974, Aeroking submitted a "Contractor's Request for Progress Payment" on each of the contracts. These three requests totalling $69,251.57 were approved by the Government's contracting officer the following day. Subsequently, on July 15, 1974, three checks in the amounts of $14,529.86, $27,077.32 and $27,644.39, respectively, were drawn on the United States Treasury and issued by the Government in payment of the progress payments. On the face of each check after the phrase "pay to the order of" appeared the following:

"McDowell National Bank
A/C Aeroking, Inc.
147 N. Diamond St.
Mercer, Pa. 16137."

According to the pleadings in this suit, all of the parties apparently agree that the Government delivered the three checks to a representative of Aeroking to be delivered to the Bank, although there is no proof of this fact. The parties do not, however, agree what happened to these checks after this initial delivery. Although the plaintiffs contend that Aeroking deposited these checks in its checking account at the McDowell National Bank, there is no evidence in the record which supports this contention nor is there any evidence that Aeroking was ever paid the proceeds of the checks nor that it in any manner ever received any monetary benefit from them. The record does show, though, that at some point the checks were delivered to and negotiated by the McDowell National Bank. This is evidenced by three stamps which were placed on each check. These stamps appeared in the following order on the back of each check:

"PAY ANY BANK, P.E.G.[2]
McDowell National
    Bank
    Sharon, PA.
60–356      M3      60–356
JUL 19     74     380 0261
                    [0255]
                    [0262]
(Note: The last four numbers vary *on each check*.)

––––––––

"FOR DEPOSIT ONLY"

––––––––

"PAY ANY BANK
MELLON BANK N.A.
    PITTSBURGH, PA.
    Jul 19 74  .  .  ."
(Note: A series of numbers are omitted.)

McDowell National Bank will be called the Bank.

---

1. Fairchild Industries, Inc. will be referred to as Fairchild or plaintiff. Aeroking, Inc. will be called Aeroking. When both Fairchild and McDowell National Bank are mentioned together, they may be called plaintiffs, as both are seeking recovery against the Government.

2. The letters "P.E.G." on the stamp of McDowell National Bank means "previous endorsements guaranteed."

The letters on the banks' stamps are different from those on the "For Deposit Only" stamp which indicates that a different stamping device was used to make the impression of the respective stamps. There is no evidence who placed the stamps on the checks nor when they were stamped.

In February, 1975, bankruptcy proceedings were instituted by Aeroking, which company is now apparently insolvent. On February 16, 1976, Fairchild filed a claim with the Office of the Judge Advocate General for the sum of $63,060.58 plus interest and costs, alleging that because the Government had negligently delivered the checks to Aeroking, Fairchild did not get paid by the bank. This claim was denied because it was not for a sum certain and sounded in tort which was barred by limitations. Fairchild initiated this action against the Government on June 26, 1978. In its petition, Fairchild asserts two counts, the first of which claims that the Government negligently transferred possession of the three checks and released them to a representative of Aeroking, who deposited them to its own account without paying Fairchild for the parts it had supplied, and by reason thereof the Government was liable for its loss. In Count Two, Fairchild alleges that the Government is guilty of a breach of contract because it did not comply with the assignment agreements which Aeroking had with McDowell National Bank in which Fairchild claims to have been a third party beneficiary. The McDowell National Bank later intervened as a party-plaintiff adopting by reference all the averments in Fairchild's petition. Fairchild is seeking to recover $63,060.58 in damages plus interest and costs, and the bank is claiming to have been damaged in the amount of $69,251.57, the total amount of the checks, and seeks judgment in that amount against the Government.[3]

The case is before the Court on cross-motions for summary judgment. Counsel for Fairchild appeared at oral argument and presented Fairchild's claim, but counsel for McDowell National Bank did not appear.

■ As stated above, the plaintiffs allege in Count One of their petitions that the Government negligently transferred possession of the three checks to a representative of Aeroking thereby causing plaintiffs' losses. This is obviously a tort claim of which this Court has no jurisdiction. 28 U.S.C.A. § 1491. It also appears that this claim is barred by the two-year statute of limitations for tort claims. 28 U.S.C.A. § 2401(b). Accordingly, we reject the tort claim of the plaintiffs.

■ Plaintiff Fairchild Industries, Inc. was a subcontractor of Aeroking's. As such, Fairchild had no privity of contract with the Government. Therefore, Fairchild's breach of contract claim must also fail. As a subcontractor, Fairchild had no standing to sue the Government because of the lack of privity of contract between them. The law is clear that subcontractors, suppliers and materialmen have no standing to sue the United States because there is no privity of contract between them and the Government. *Merritt v. United States*, 267 U.S. 338, 45 S.Ct. 278, 69 L.Ed. 643 (1925); *affirming* 58 Ct.Cl. 371 (1923); *Somerset Machine & Tool Co. v. United States*, 144 Ct.Cl. 481, 482, *cert. denied*, 361 U.S. 825, 80 S.Ct. 73, 4 L.Ed.2d 69 (1959); *Erie Basin Metal Products, Inc. v. United States*, 124 Ct.Cl. 95, 98, 109 F.Supp. 402 (1953); *Warren Bros. Roads Co. v. United States*, 123 Ct.Cl. 48, 105 F.Supp. 826 (1952); *Kilgore v. United States*, 121 Ct.Cl. 340 (1952); *Petrin v. United States*, 90 Ct.Cl. 670, 672–673 (1940), and cases there cited.

In *Somerset Machine & Tool Co., supra,* the Court held, at pp. 482–483:

**3.** The record shows that after Aeroking made the assignments to the Bank, the Bank wrote a letter to Fairchild stating that upon receipt of the proceeds of the contract, it would remit them to Fairchild. Thereafter, Fairchild sued the Bank in the United States District Court for the Western District of Pennsylvania in Civil Action No. 76–26 for $69,251.57, the amount of the 3 checks involved in the instant case. That case is continued until the present case is decided. We express no opinion regarding that case as the record is not before us and the case is between Fairchild and the Bank. The Government is not involved.

"A subcontractor, of course, has no right of action against the Government due to lack of privity of contract * *."

And, still further, the Court held, in *Petrin, supra,* at pp. 672–673:

"The Tucker Act, Sec. 145 of the Judicial Code, 24 Stat. 505, confers jurisdiction upon this Court to hear and determine claims founded 'upon any contract, express or implied with the Government of the United States.' Obviously the claims upon which plaintiffs sue is not so founded. As the plaintiffs were not parties to the contract between the prime contractor and the defendant they have no right under it and can not maintain suit * * *."

At oral argument, counsel for Fairchild admitted that the above principles were correct and conceded that Fairchild had no standing to sue the Government in this case.

▪ We now consider the claims of the Bank. We have no jurisdiction of its tort claim that the Government was negligent in delivering the checks to a representative of Aeroking and, as stated above, that claim is accordingly rejected. The Bank also asserts a breach of contract claim. It says that the Government breached the assignment agreements between Aeroking and the Bank by delivering the checks to Aeroking. The short answer to this argument is that the Government was not a party to the assignment agreements and in fact did not agree to anything. It may be argued that under the Assignment of Claims Act when the Government received copies of the assignment agreements and acknowledged their receipt in writing, it became bound by the clause in the assignments that provided:

"___payment thereunder will be made by checks drawn to the order of the assigned [The Bank]."

However, this is of no help to the Bank. The checks were in fact drawn to the order of the Bank and thereafter paid to the Bank. The Government was bound by the assignments to do nothing more. There was nothing whatever in the assignments that specified how the checks were to be delivered to the Bank, and even if there had been, the Government was not a party to the assignments. The Bank claims that the Government should have mailed the checks to the Bank. There is not a scintilla of evidence that this method of delivery was required.[4] The Government could have sent the checks to the Bank by any effective means, and its obligation in that respect would have been fulfilled so long as the Bank received them. It is undisputed, and the record shows, that the Bank is the payee in the checks and that the Bank received and negotiated them for payment and received the proceeds of the checks when they were paid by the Treasury.

The Bank contends that the representative of Aeroking who received the checks from the Government for delivery to the Bank took them to the Bank and deposited them to the account of Aeroking. There is no proof in the record that this occurred, nor is there any evidence before us that Aeroking ever received the proceeds of the checks. The Bank wholly failed to prove these facts. But even if they did occur, the error was that of the Bank and not of the Government, because what the Bank did with the checks after it received them was its business and of no concern or responsibility of the Government.

It is clear that the checks were negotiable instruments. Section 3–104(1) of the Uniform Commercial Code (the Code) defines a negotiable instrument as follows:

"Any writing to be a negotiable instrument within this Article must

(a) be signed by the maker or drawer; and

**4.** The record shows that in the past the Government had sent other checks to the Bank without incident, but there is no showing how they were sent except on one occasion when the Bank on March 29, 1974, notified the Government in writing that it had authorized a representative of Aeroking to personally pick up checks available on that date made payable to McDowell National Bank on Aeroking, Inc. assigned contracts. No difficulty is shown regarding that method of delivering those checks to the Bank.

(b) contain an unconditional promise or order to pay a sum certain in money and no other promise, order, obligation or power given by the maker or drawer except as authorized by this Article; and

(c) be payable on demand or at a definite time; and

(d) be payable to order or to bearer."

The checks in question met these requirements. They were each signed by the maker (drawer) and contained an unconditional promise or order to pay a sum certain on demand to the order of McDowell National Bank at its address.

As stated above, the checks had stamped on their reverse sides the words "For Deposit Only." There is no evidence showing who stamped these words on the checks nor when they were thus stamped. Under the Code, these stamps constituted a special or restrictive indorsement that required the checks to be deposited only to the account of the payee of the checks (the Bank) in the absence of any other indorsement, and there were none, except that of the Bank. Since the indorsement of the Bank appears in a stamp form above the "For Deposit Only" stamp on each of the checks, and there are no other indorsements on the checks, they could according to law only be deposited to the account of the Bank. This is in accord with Section 3–204(1) of the Code which defines a special indorsement as follows:

"(1) *A special indorsement specifies the person to whom or to whose order it makes the instrument payable.* Any instrument specially indorsed becomes payable to the order of the special indorsee *and may be further negotiated only by his indorsement.*" (Emphasis supplied.)

Under the circumstances shown by the record in this case, only the Bank as payee and holder of the checks could negotiate them by indorsement. Section 3–202(2) of the Code provides:

"*An indorsement must be written by or on behalf of the holder* and on the instrument or on a paper so firmly affixed thereto as to become a· part thereof." (Emphasis supplied.)

There is no particular way in which an indorsement is required to be made. Comment 2 to Section 3–401 of the Code states that an indorsement may be made in a variety of ways, such as, "handwritten, typed, printed, or made in any other manner." In the instant case, the Bank indorsed the checks with an ink stamp that impressed letters and numbers on the back of the checks.

The Bank contends that only one of its executive officers could handle and indorse the checks because of an agreement it had to that effect with Fairchild. We do not agree. The Government was not a party to that agreement and is not bound by it. There is no proof that the Government even knew about this agreement. The record does not show who indorsed the checks for the Bank, but that is not material. Section 3–403(1) provides that agents may sign negotiable instruments and thus bind their principals and that no particular form of appointment is necessary to establish such authority on the part of agents to bind their principals. Comment 4 to § 3–404 explains that the principal may be estopped from denying the genuineness of the signature and from alleging the negligence of its agent in affixing the principal's signature where it ratifies the signature. This is especially true in this case, regardless of who placed the Bank's stamp on the checks, because it appears from the record that the Bank negotiated the checks under its signature for payment by the Treasury through the Mellon Bank in Pittsburgh, Pa., as shown by the stamp of that bank on the back of each check. Furthermore, the Treasury paid the checks on presentment and has the cancelled checks in its possession. We conclude from the evidence that the Treasury forwarded the proceeds of the check upon their payment through banking channels, including the Mellon Bank, to the McDowell National Bank. We have no information or evidence whether the Bank credited the proceeds of the checks to Aeroking or to itself upon receiving them from the Treasury, but that was the busi-

ness and sole responsibility of the Bank in which the Government had no interest.[5]

We hold that the Government issued the 3 checks in question payable to the Bank in payment of the progress payments of Aeroking in accordance with Aeroking's assignment agreements with the Bank; that the checks were delivered to the Bank; that the Bank indorsed and negotiated them for payment through banking channels; that the checks were paid by the Treasury upon presentment and the proceeds were paid to the Bank through banking channels; and that there has been no breach of contract by the Government.

Accordingly, the motion for summary judgment of the plaintiffs is denied, and the cross-motion of the defendant is granted and plaintiffs' petitions are dismissed.

---

**5.** The record shows that the Bank filed a claim with its insurance carrier under its errors and omissions policy. We have no information as to what happened to this claim.