**J. Alfred RIDER, M.D.**

v.

**The UNITED STATES.**

No. 683–83C.

United States Claims Court.

April 19, 1985.

Gregory P. Einhorn, San Francisco, Cal., for plaintiff.

Richard W. Oehler, Washington, D.C., with whom was Acting Asst. Atty. Gen. Richard K. Willard, Washington, D.C., for defendant.

## OPINION

YOCK, Judge.

This contract case comes before the Court on the defendant's motion for sum-

mary judgment. While the defendant has raised various arguments in its motion, its primary argument is that this Court lacks subject matter jurisdiction over the plaintiff's claim for a postal refund and consequential damages for the untimely delivery of political mail by the United States Postal Service. For the reasons set forth below, the defendant's motion for summary judgment is granted, and the plaintiff's complaint is to be dismissed without prejudice.

### Facts

On September 23, 1982, a group named "Citizens for Proposition M" (CPM) obtained third-class bulk mail Permit No. 15037 at the Rincon Annex of the San Francisco, California, Post Office. The bulk mailing permit was obtained so that CPM could mail election materials pertaining to the Proposition M initiative to voters in the 1982 San Francisco general municipal election.[1] Accordingly, CPM deposited $34,297.12[2] in a bulk mailing account, at the Rincon Annex, to cover postage due for the organization's bulk mailings as they were submitted to the postal facility.

The plaintiff, J. Alfred Rider, delivered 431,967 circulars to the Rincon Annex for third-class mailing.[3] He alleges that he requested expeditious handling of these circulars and that he received assurances that such circulars would be delivered within 48 hours.

In a November 4, 1982, letter, the plaintiff complained to the Supervisor of the San Francisco Mail Classification Center, Mr. Michael L. Shea, that CPM circulars were delivered at 2:00 p.m. on election day,

November 2, 1982. The plaintiff's letter, in pertinent part, stated that:

> This particular brochure was delivered to the Rincon Annex Post Office on Tuesday, October 26, at approximately 10:00 a.m., and we were assured that delivery would be made within 48 hours. I would think, under the circumstances, we are entitled to a refund from the Postal Department for this gross negligence.[4]
>
> I would appreciate it also if you would check your other substations and see whether our brochures were held up in any other areas of the city.

The subsequent postal investigation, requested by the plaintiff, revealed a possible delay in delivery on two routes in the Mission District of San Francisco. One of these routes consisted of 545 possible residential delivery points and 3 possible business delivery points, and the other route consisted of 736 possible residential delivery points and 16 possible business delivery points. However, even these mailings were delivered by 3:00 p.m. on election day. There is no indication that delivery of the CPM circulars was delayed on any other mail route. Thus, approximately 1,300 of CPM's circulars (out of a total volume of 431,967) were delivered on election day, while the remainder were delivered *prior* to election day.

On November 19, 1982, the Customer Complaint Officer, Ms. Pura Z. Alabastro, at the San Francisco Post Office, informed the plaintiff that "[n]o refund is in order here as only the delivery time of Express Mail is guaranteed." Following further

---

1. The 1982 San Francisco general municipal election was held on November 2, 1982, with the polls remaining open until 8:00 p.m.

2. The following deposits were made: $6,000 on October 19, 1982; $23,000 on October 25, 1982; $5,200 on October 26, 1982; and $97.12 on October 27, 1982, for a total of $34,297.12.

3. The respective dates, times, number of pieces, and applicable postal charges for each mailing were:

1. October 19, 1982; 11:29 a.m.;  57,851 pieces; $ 4,570.23.
2. October 19, 1982; 11:20 a.m.;   1,799 pieces;    167.31.
3. October 26, 1982;  4:05 p.m.;   7,867 pieces;    732.71.

4. October 26, 1982;  4:18 p.m.; 274,696 pieces;  21,700.98.
5. October 27, 1982; 10:45 a.m.;   1,704 pieces;     158.56.
6. October 27, 1982; 10:33 a.m.;     843 pieces;      78.69.
7. October 27, 1982; 10:33 a.m.;  51,167 pieces;   4,042.19.
8. October 27, 1982; 10:50 a.m.;  36,031 pieces;   2,846.45.

4. Although the Court's decision is not based on the plaintiff's claim sounding in tort, the plaintiff's letter clearly raises an inference that his claim does sound in tort. If so, this would be an additional reason why this Court would lack jurisdiction over his claim. *H.H.O., Inc. v. United States*, 7 F.2d 703, 705–06 (April 8, 1985).

complaints by the plaintiff, in a letter dated February 2, 1983, Mr. Shea, writing for Ms. Ruth Alexander, the Manager of the San Francisco Mail Classification Center, apologized for the delay but stated that:

> [A]lthough your mail was not delivered until November 2, 1982, it was in fact delivered. Since the Postal Service does not guarantee the delivery of Third-Class mail within a specific time there are no provisions for a postage refund. I have included photocopies of Sections 147.2 and 630 of the Domestic Mail Manual. These are the guidelines that we must follow in handling your request for a refund. I apologize for the inconvenience this matter has caused you.

The plaintiff filed this action on November 14, 1983, claiming that a contract for prompt delivery of CPM's materials was created and breached by the defendant's delays. The defendant has moved for summary judgment based primarily on the grounds that this Court lacks subject matter jurisdiction over this dispute.

### Discussion

The United States Postal Service (USPS) is authorized to establish "reasonable and equitable classes of mail and reasonable and equitable rates of postage and fees for postal services." 39 U.S.C. § 3621. Further, USPS is directed "to provide types of mail service to meet the needs of different categories of mail and mail users," but it is forbidden to establish classifications, rates, and fees which "make any undue or unreasonable discrimination among users of the mails" or "grant any undue or unreasonable preferences to any such user." 39 U.S.C. § 403(b)(2), (c).

In order to carry out these duties, USPS is given extensive specific and general powers. In particular, USPS is granted, *inter alia*, the following powers:

---

(1) to provide for the collection, handling, transportation, delivery, forwarding, returning, and holding of mail, and for the disposition of undeliverable mail;

(2) to prescribe, in accordance with this title, the amount of postage and the manner in which it is to be paid.

39 U.S.C. § 404(a). Under such statutory authority, USPS has issued detailed regulations and management instructions concerning the various classes of mail and types of postal services in its Domestic Mail Manual (DMM).[5]

In general, bulk third-class mail is the medium of choice for the distribution of circulars, since it is designed for the relatively inexpensive dissemination of circulars and other printed matter, rather than the expeditious transmission of important business or personal correspondence. Accordingly, it may not contain handwritten material or "actual or personal correspondence," which must be sent as first-class mail. DMM § 621.3. It also may not be sealed against postal inspection. DMM § 621.4. Postal regulations expressly state that third-class mail may receive deferred service and that the USPS does not guarantee the delivery of third-class mail within a specified time.[6] DMM § 630. Customers wishing more expeditious handling may use first-class mail or Express Mail, with Express Mail being the only class of mail for which the USPS guarantees a time of delivery. DMM §§ 230, 331, 332.

The standards governing the refund of postage are contained in DMM § 147.2. In general, refunds are considered justified only "[w]hen postage and special or retail service fees have been paid, and no service is rendered, or when the amount collected was in excess of the lawful rate." DMM § 147.211.

---

5. The DMM, a loose-leaf compilation of the rules, regulations, and detailed instructions concerning the USPS, was adopted on July 30, 1979. 44 Fed.Reg. 39,742 (July 6, 1979). The Domestic Mail Manual is incorporated by reference into the Code of Federal Regulations at 30 C.F.R. § 111. 44 Fed.Reg. 39,851 (July 6, 1979).

Thus, the plaintiff is presumed to have notice of its contents. 44 U.S.C. § 1507.

6. DMM § 630 states: "Third-class mail may receive deferred service. The Postal Service does not guarantee the delivery of third-class mail within a specified time."

The USPS has established special operating procedures to ensure that mailings of political candidates and parties "are processed properly, delivered with equitable care and attention and that proper records are maintained." Postal Operations Manual (POM) § 454.11. In order to minimize late delivery of campaign materials, the USPS utilizes special reusable tags to identify campaign mailings during mail processing; it designates liaison officers to provide candidates with information concerning postal rates and mailing requirements; it attempts to identify and make contact with all political candidates and election committees; and it provides special attention to delays and complaints concerning political mailings. POM § 454.3. Although these provisions do not establish special service standards or delivery guarantees for political campaign mail, they represent an attempt to minimize the number of instances in which such mail is mishandled or delayed. These procedures do not specifically apply to the mailings of a group such as CPM, however, which is neither a political candidate nor a political party. POM § 454.2.

In the instant case, the plaintiff alleges the existence of a contract obligating the USPS to deliver CPM's third-class mail within 48 hours. Further, the plaintiff argues that he was a party to this contract and requests relief in his individual capacity. The holder of Permit No. 15037, however, was not the plaintiff, but, rather, Citizens for Proposition M.[7] The plaintiff responds that he and CPM are "one and the same," that he acted as CPM's agent, and that all CPM funds, including expenditures of $100,000 for printing and $35,000 for postage for the political mailing at issue, were provided by him.

Noticeably lacking, however, is any documentary proof in support of the plaintiff's allegations. The financial disclosure forms filed by CPM with the State of California do not mention the plaintiff. Nor does his name appear as an officer of CPM or as a contributor to the organization. The only major CPM contributor listed is an organization, the Golden Gate Medical Lodge, with which the plaintiff has failed to establish a connection. Further, the total CPM contributions listed on these forms is only $112,523, less than the sum of the plaintiff's alleged expenditures for the organization of $135,000. CPM's list of expenses also does not reflect the plaintiff's alleged expenditure of $100,000 for the election brochures.

■ In order to bring this action, the plaintiff must establish privity of contract with the Postal Service. See *Fairchild Industries, Inc. v. United States*, 223 Ct.Cl. 315, 320, 620 F.2d 807, 809 (1980), and *United Electric Corp. v. United States*, 227 Ct.Cl. 236, 240, 647 F.2d 1082, 1084, *cert. denied*, 454 U.S. 863, 102 S.Ct. 322, 70 L.Ed.2d 163 (1981). This he has not done. Assuming, however, that the plaintiff can establish privity of contract between himself and the USPS, the plaintiff asks this Court, in counts three and four of his complaint, to imply a "quasi-contractual obligation" on the part of the USPS to refund monies to the plaintiff on a theory of unjust enrichment. This Court does not have jurisdiction to impose such a contract, since such a contract would be a contract implied-in-law. *Pacific Gas & Electric Co. v. United States*, 3 Cl.Ct. 329, 340–41 (1983), *aff'd* 738 F.2d 452 (Fed.Cir.1984); *Algonac Manufacturing Co. v. United States*, 192 Ct.Cl. 649, 674, 428 F.2d 1241, 1256 (1970). Thus, counts three and four of the plaintiffs' complaint must be dismissed on the basis that this Court lacks the jurisdiction necessary to hear such claims.

■ The plaintiff's claims for relief under the Contract Disputes Act of 1978, 41 U.S.C. § 601 *et seq.*, counts one and two of his complaint, are also jurisdictionally defective, since they do not involve a contract cognizable under the Contract Disputes Act. In particular, section 602(a) limits the applicability of the Contract Disputes Act

7. The representative of CPM who signed the various permits on behalf of CPM was Dr. Dean Rider, rather than the plaintiff, Dr. J. Alfred Rider.

to contracts falling into the following categories:

   (1) the procurement of property, other than real property in being;

   (2) the procurement of services;

   (3) the procurement of construction, alteration, repair or maintenance of real property; or,

   (4) the disposal of personal property.

41 U.S.C. § 602(a). The contract alleged by the plaintiff does not fall into any of these categories, since the plaintiff alleges a contract for a governmental entity to provide services, rather than to procure them as the Contract Disputes Act envisions.[8]

■ However, assuming that this action is within the limitation of section 602(a), the plaintiff must still establish that he has complied with the direct access jurisdictional requirements of section 605. In order to bring a direct access action to this Court under the Contract Disputes Act, the plaintiff must have: (1) presented a written and properly certified claim to the Government contracting officer, and (2) obtained a final decision by that contracting officer on such claim. *T.J.D. Services, Inc. v. United States*, 6 Cl.Ct. 257, 260 (1984); *Thoen v. United States*, 5 Cl.Ct. 823, 825 (1984); *Milmark Services, Inc. v. United States*, 231 Ct.Cl. 954, 956 (1982). *See also Troup Bros. v. United States*, 231 Ct.Cl. 707 (1982); *White Plains Iron Works, Inc. v. United States*, 229 Ct.Cl. 626 (1981); *Paragon Energy Corp. v. United States*, 227 Ct.Cl. 176, 645 F.2d 966 (1981).

Specifically, 41 U.S.C. § 605(c)(1) requires that:

For claims of more than $50,000, the contractor shall certify that the claim is made in good faith, that the supporting data are accurate and complete to the best of his knowledge and belief, and that the amount requested accurately reflects the contract adjustment for which the contractor believes the government is liable.

This Court has consistently interpreted this provision of the Contract Disputes Act as requiring the furnishing of such a certificate, by the contractor, in order for this Court to acquire direct access jurisdiction over a contract claim exceeding $50,000. *T.J.D. Services, Inc. v. United States, supra,* 6 Cl.Ct. at 260; *Palmer & Sicard, Inc. v. United States*, 4 Cl.Ct. 420, 422 (1984); *Conoc Constr. Corp. v. United States*, 3 Cl.Ct. 146, 148 (1983); *Metric Constr. Co. v. United States*, 1 Cl.Ct. 383, 389 (1983); *Arlington Alliance, Ltd. v. United States*, 231 Ct.Cl. 347, 357, 685 F.2d 1353, 1359 (1982). *Accord W.M. Schlosser Co. v. United States*, 705 F.2d 1336 (Fed.Cir. 1983); *Skelly and Loy v. United States*, 231 Ct.Cl. 370, 685 F.2d 414 (1982); *W.H. Moseley Co. v. United States*, 230 Ct.Cl. 405, 677 F.2d 850, *cert. denied*, 459 U.S. 836, 103 S.Ct. 81, 74 L.Ed.2d 77 (1982); *Paul E. Lehman, Inc. v. United States*, 230 Ct.Cl. 11, 673 F.2d 352 (1982); *Folk Constr. Co. v. United States*, 226 Ct.Cl. 602 (1981).

Initially, the plaintiff alleges that the postal employee to whom he delivered CPM's circulars was a "contracting officer" or the authorized representative of a contracting officer.[9] The plaintiff then claims that his November 4, 1982, letter to

---

**8.** Several decisions by this Court's predecessor, the U.S. Court of Claims, held that no contract exists in cases of lost, damaged, or delayed mail, unless the Postal Service has consented to liability in a statute or a regulation. *See Shull v. United States*, 228 Ct.Cl. 750, (1981); *Marine Insurance Co. v. United States*, 187 Ct.Cl. 621, 410 F.2d 764 (1969).

**9.** In *Grundy v. United States*, 2 Cl.Ct. 596, 599 (1983), this Court held that: "[A] claimant for money damages for breach of an express or implied in fact contract must plead and prove that the officer who supposedly made the contract had authority to obligate appropriated funds for such purpose. *Kania v. United States, supra*, 227 Ct.Cl. 458 at 465, 650 F.2d 264 at 268; *Grismac Corp. v. United States*, 214 Ct.Cl. 39, 45, 556 F.2d 494, 497 (1977); *Housing Corp. of America v. United States*, 199 Ct.Cl. 705, 711, 468 F.2d 922, 925 (1972). Apparent authority is not enough; plaintiff has the responsibility of establishing that the agent had actual authority. *Jackson v. United States*, 216 Ct.Cl. 25, 41 n. 2, 573 F.2d 1189, 1197 n. 2 (1978)." *Cf. Portmann v. United States*, 674 F.2d 1155 (7th Cir.1982).

Mr. Shea constituted a claim as defined in section 605(a). 41 U.S.C. § 605(a). The plaintiff must thus consider Mr. Shea to be a contracting officer, since a claim under the Act must be submitted in writing to a contracting officer. 41 U.S.C. § 605(a). Later, however, the plaintiff contends that Ms. Pura Z. Alabastro is a USPS contracting officer and that her November 19, 1982, letter to the plaintiff constituted a contracting officer's final decision.

The Contract Disputes Act defines a contracting officer as:

> [A]ny person who, by appointment in accordance with applicable regulations, has the authority to enter into and administer contracts and make determinations and findings with respect thereto. The term also includes the authorized representative of the contracting officer, acting within the limits of his authority.

41 U.S.C. § 601(3). In this regard, the only USPS employee with contracting officer status in the San Francisco Post Office is the Postmaster, Mr. Jefferson Wilson. Mr. Wilson's contract authority, however, is limited to the *procurement of supplies and minor repairs* not exceeding $2,000 and cannot be delegated to anyone else in the San Francisco Post Office.

▮ As a result, it appears that the plaintiff has failed to properly submit a written claim to a contracting officer. In this regard, 41 U.S.C. § 609(a) provides that:

> (1) Except as provided in paragraph (2), and in lieu of appealing the decision of the contracting officer under section 605 of this title to an agency board, a contractor may bring an action directly on the claim in the United States Claims Court, notwithstanding any contract provision, regulation, or rule of law to the contrary.

Thus, until a final decision has been rendered by the contracting officer, the plaintiff has not exhausted his administrative remedies. *Tri-Central, Inc. v. United States,* 230 Ct.Cl. 842, 845 (1982). The linchpin for appealing claims under the Contract Disputes Act is the contracting officer's final decision. *T.J.D. Services, Inc. v. United States, supra,* 6 Cl.Ct. at 261; *Paragon Energy Corp. v. United States, supra,* 227 Ct.Cl. at 177, 645 F.2d at 967. *See also Conoc Constr. Corp. v. United States, supra,* and *Paul E. Lehman, Inc. v. United States, supra.*

▮ Even assuming, however, that the plaintiff did submit a written claim to a contracting officer, he has admitted that he failed to certify such claim, which sought damages in excess of $50,000. As the Court of Claims stated in *Skelly and Loy v. United States, supra:*

> In brief, certification plays a serious role in the statutory scheme because it triggers a contractor's potential liability for a fraudulent claim under section 604 of the Act. It is also designed to "discourage the submission of unwarranted contractor claims and to encourage settlements."

231 Ct.Cl. at 376 n. 11, 685 F.2d at 418 n. 11. Thus, the plaintiff's letter of November 4, 1982, constituted the submission of an invalid claim. 41 U.S.C. § 605(c)(1); *Folk Constr. Co. v. United States, supra,* 226 Ct.Cl. at 604.

▮ The plaintiff has responded, however, that the certification requirement was waived by Ms. Alabastro in her issuance of a final decision on November 19, 1982. According to this Court's prior decisions, however, absent the submission of a properly certified claim to the contracting officer, no "decision" by the contracting officer is possible. *Palmer & Sicard, Inc. v. United States,* 6 Cl.Ct. 232, 236 (1984); *Conoc Constr. Corp. v. United States, supra,* 3 Cl.Ct. at 147–48. *See also Paul E. Lehman, Inc. v. United States, supra; Paragon Energy Corp. v. United States, supra.* The fact that a Government contracting officer has rendered a final decision on the merits of an uncertified claim is of no consequence, as he had no authority to waive a requirement that Congress imposed. *Warchol Constr. Co. v. United States,* 2 Cl.Ct. 384, 389 (1983). *See also Paul E. Lehman, Inc. v. United States, supra,* 230 Ct.Cl. at

17, 673 F.2d at 356; *W.H. Moseley Co. v. United States, supra.*

Therefore, since this Court is convinced that the plaintiff has failed to properly invoke this Court's jurisdiction, it need not address the other substantive issues of law raised in the defendant's motion for summary judgment. As regards counts one and two in the plaintiff's complaint, the plaintiff has improperly invoked this Court's jurisdiction, since the plaintiff's claim does not involve a contract cognizable under the Contract Disputes Act of 1978. As regards counts three and four in the plaintiff's complaint, this Court clearly has no jurisdiction over contracts implied-in-law. Finally, as regards count five in the plaintiff's complaint, in view of the above discussion, the plaintiff has failed to state a claim upon which relief can be granted, since a claim of equitable estoppel, standing alone, does not invoke this Court's jurisdiction.

## CONCLUSION

For the foregoing reasons, the defendant's motion for summary judgment is granted, and the plaintiff's complaint is to be dismissed without prejudice.