# PARAGON ENERGY CORPORATION

v.

## The UNITED STATES.

### No. 98–80C.

United States Court of Claims.

April 8, 1981.

Sally A. Blackmun, Atlanta, Ga., attorney of record, for plaintiff; J. Ben Shapiro, Jr. and Peter R. Weisz, Atlanta, Ga., of counsel.

John Charles Ranney, Washington, D. C., with whom was Asst. Atty. Gen. Alice Daniel, Washington, D. C., for defendant.

Before COWEN, Senior Judge, and KUNZIG and SMITH, Judges.

## ON DEFENDANT'S MOTION TO DISMISS

KUNZIG, Judge:

This government contracts case comes before the court on defendant's motion to dismiss for failure to state a claim. Plaintiff has brought suit under the Contract Disputes Act, alleging that it is entitled to contract modification and monetary compensation to mitigate the effect of a unilateral bid mistake. The sources of the alleged entitlement are twofold: 1) the equitable principles which this court has implemented in reforming contracts under the Tucker Act, and 2) the contract adjustment authority contained in Public Law 85–804. Plaintiff previously submitted its claim unsuccessfully before the contracting officer.

The Government contends that we lack jurisdiction to entertain this suit under the Contract Disputes Act. It points out, quite rightly, that the linchpin for appealing claims under the Contract Disputes Act is the contracting officer's "decision". No appeal, whether under 41 U.S.C. § 606 (Supp. II 1978) to the agency board of contract appeals or to this court under § 609, may be taken without such a "decision". In this case, continues the Government, no contracting officer "decision" could be rendered "since plaintiff's claim is not one susceptible to such a decision."

The Government is only partially correct. The 85–804 portion of plaintiff's claim was not susceptible to a decision of the contracting officer. The request for equitable reformation, however, clearly fell within the contracting officer's authority under the Contract Disputes Act. Hence, we conclude that we have an adequate jurisdictional ground for proceeding under the Contract Disputes Act.

### I. Background

A. *Contract Reformation in the United States Court of Claims.* Although a contrary view apparently prevailed in earlier times,[1] cases decided subsequently to the passage of the Tucker Act in 1887 have uniformly upheld the power of this court to reform a government contract, provided that such action is taken as an incident to the rendition of money a judgment. This is our first legal strand.

Thus, it was held in *United States v. Milliken Imprinting Co.*, 202 U.S. 168, 173–174, 26 S.Ct. 572, 573, 50 L.Ed. 980 (1906) (Holmes, J.), that the Court of Claims was authorized to reform a government contract in connection with a claim for money upon the contract. Although finding that reformation would not be proper under the particular circumstances, the court rejected the government's contention that the Court of Claims was without reformation powers, which contention was founded on the theo-

1. It was stated in *Harvey v. United States*, 105 U.S. 671, 679, 26 L.Ed. 1206 (1881), in order to explain why certain contractors had applied to Congress for a special act authorizing the Court of Claims to reform a contract and render judgment thereon, that the Court of Claims had no equitable jurisdiction to reform a contract.

ry that the Court of Claims had no jurisdiction in equity, and that although the contractor's demand was for money under a contract as it should have been drawn, yet that demand was incident to the reformation asked. While reformation is not an incident to an action at law, but can be granted only by a court of equity, which may then go on to grant relief on the contract as reformed, observed the court, yet the Court of Claims was warranted in taking jurisdiction under a "fairly liberal interpretation" of the Tucker Act, giving the Court of Claims jurisdiction of all claims founded upon any contract, express or implied, with the United States. "A claim for money upon a contract, which would be like a right of action at common law but for the need of help from equity to establish the contract," concluded the court, seemed to fall within the words of the statute "in their obvious, literal sense." *See, e. g., Highway Products, Inc. v. United States*, 208 Ct.Cl. 926, 945–946, 530 F.2d 911, 922 (1976).

In *Iowa-Wisconsin Bridge Co. v. United States*, 114 Ct.Cl. 464, 504, 84 F.Supp. 852, 863 (1949), *cert. denied*, 339 U.S. 982, 70 S.Ct. 1020, 94 L.Ed. 386 (1950), we held that "where a party would have had the legal right to recover money damages from the United States under a written instrument except for the omission by mutual mistake of some essential element from that written instrument, and where it is clear that both parties intended such element to be included, [the Court of Claims] has equitable jurisdiction to reform the instrument so as to express the understanding and intentions of the parties, and for the purpose of determining whether the claim, if established, is a valid one against the United States, and having so determined, to award a money judgment." *See, e. g., Higgs v. United States*, 212 Ct.Cl. 146, 150, 546 F.2d 373, 376 (1976).

This court in *Chernick v. United States*, 178 Ct.Cl. 498, 504–507, 372 F.2d 492, 496–497 (1967), a unilateral mistake case, implemented its equitable jurisdiction so as to reform a government contract through the grant of a price increase to a contractor. The court invoked the principle that when a bidder has made an error in its bid price and the contracting officer has reason to know of the error, but takes advantage of it, and the bidder performs in accordance with the award, the price will be corrected upon presentation of evidence clearly and convincingly establishing what the price would have been but for the error. *See, e. g., Bromley Contracting Co., Inc. v. United States*, 219 Ct.Cl. 517, 596 F.2d 448, 453–454 (1979); *Burnett Electronics Lab., Inc. v. United States*, 202 Ct.Cl. 463, 472, 479 F.2d 1329, 1333 (1973).[2] This principle, as will soon be made clear, is crucial to the case now before us.

B. *Contract Adjustment Under Public Law 85–804.* Pursuant to Public Law 85–804—the second legal strand in this case— "The President may authorize any department or agency of the Government which exercises functions in connection with the national defense ... to enter into ... contracts or into amendments or modifications of contracts ... without regard to other provisions of law relating to the making, performance, amendment, or modification of contracts, whenever he deems that such action would facilitate the *national defense.*" § 1, 72 Stat. 972 (1958), 50 U.S.C. § 1431 (1976) (emphasis supplied). The same section continues: "[This] authority ... shall not be utilized to obligate the United States in an amount in excess of $50,000 without approval by an official at or above the level of an Assistant Secretary or his Deputy, or an assistant head or his deputy, of such department or agency, or by

---

**2.** *See generally* Annot., 19 A.L.R.Fed. 645 (1974); Doke, *Mistakes in Government Contracts—Error Detection Duty of Contracting Officers*, 18 Sw.L.J. 1 (1964); Grimes and Walker, *Unilateral Mistakes in Construction Bids: Methods of Proof and Theories of Recovery—A Modern Approach*, 5 B.C.Ind. and Comm.L.Rev. 213 (1964); Ramey and Erlewine, *Mistakes and Bailouts of Suppliers Under Government Contracts and Subcontracts—A Study of Doctrine, Practice and Adhesions*, 39 Cornell L.Q. 634 (1954); Welch, *Mistakes in Bids*, 18 Fed.B.J. 75 (1958); 3 Corbin on Contracts §§ 597–621 (1960).

a Contract Adjustment Board established therein." The section further provides that the obligational authority which it confers is subject to a one-House veto if utilized to obligate the United States in an amount in excess of $25,000,000. President Eisenhower made the necessary authorizations to implement the law in an executive order of November 14, 1958. Exec.Order No. 10789, 23 Fed.Reg. 8897 (1958), *reprinted in* 50 U.S.C. § 1431 app., at 1918 (1976).[3]

Uniform regulations of the Defense Department and Armed Services for implementing Public Law 85–804 are set forth in DAR(ASPR) 17–000–17–403. *See* 4 CCH Gov't Contracts Rptr. ¶¶ 35,251 *et seq. See also* FPR 1–17.000—1–17.403, 7 CCH Gov't Contracts Rptr. ¶¶ 66,820 *et seq.* Contract Adjustment Boards are established pursuant to DAR(ASPR) 17–202; further delegations are made to various procuring and other high-level officials by DAR(ASPR) 17–203. The latter officials do not have authority to obligate the Government in an amount in excess of $50,000, DAR(ASPR) 17–205.2(ii), but must submit the case to the cognizant Contract Adjustment Board, DAR(ASPR) 17–203(a)(iii)(A). The general criterion for a contract adjustment is whether the action requested "will facilitate the national defense." DAR(ASPR) 17–204.1. The regulations specify, *inter alia*, that mistakes can be remedied under 85–804. The regulations give as an example of the type of situation in which modification to correct or mitigate the effect of a mistake may be appropriate, "a mistake on the part of the contractor which is so obvious that it was or should have been apparent to the contracting officer." DAR(ASPR) 17–204.3(ii). Mutual mistake situations are also covered. DAR(ASPR) 17–204.3(i) and (iii). "Any person seeking an adjustment under [Public Law 85–804] . . . may file a request . . . with the cognizant contracting officer or his . . . representative." DAR(ASPR) 17–207.1.[4]

C. *The Contract Disputes Act of 1978.* Under the Contract Disputes Act of 1978, effective March 1, 1979, Pub.L. No. 95–563, 92 Stat. 2383 (1978), 41 U.S.C. §§ 601–613 (Supp. II 1978), "All claims by a contractor against the government relating to a contract shall be in writing and shall be submitted to the contracting officer for a decision." § 605(a).[5] "The contracting officer's decision on the claim shall be final and conclusive . . . unless an appeal or suit is

---

**3.** Public Law 85–804 further provides that it "shall be effective only during a national emergency declared by Congress or the President." Pub.L. No. 85–804, § 5, 72 Stat. 973 (1958), 50 U.S.C. § 1435 (1976). President Eisenhower activated Public Law 85–804 on the basis of a then existing national emergency proclaimed on December 16, 1950. On September 14, 1976, Congress enacted the National Emergencies Act, Pub.L. No. 94–412, 90 Stat. 1255 (1976), 50 U.S.C. §§ 1601–1651 (1976), which provides that "All powers and authorities possessed by the President, any other officer or employee of the Federal Government, or any executive agency . . . as the result of the existence of any declaration of national emergency in effect on September 14, 1976 are terminated two years from [that date]." The provisions of Public Law 85–804, however, are expressly excluded from the operation of the Act. § 502(a)(6), 90 Stat. 1258 (1976), 50 U.S.C. § 1651(a)(6) (1976). Thus, for the narrow purpose of continuing the effectiveness of Public Law 85–804, a state of national emergency is deemed to be ongoing.

**4.** *See generally* Jansen, *Public Law 85–804 and Extraordinary Contractual Relief,* 55 Geo.L.J. 959 (1967). An important limitation is that

"No contracts, amendments, or modifications shall be entered into under the authority of the Act . . . unless other legal authority in the Department concerned is deemed to be lacking or inadequate. . . ." DAR(ASPR) 17–205.1(b)(ii). The Comptroller General, under his authority to settle and adjust all claims, 31 U.S.C. § 71 (1976), will also rescind or reform contracts based upon mistake. *See* 4 Report of the Commission on Government Procurement 53 (1972). The Comptroller General has made partial delegations of this authority under several regulations: DAR(ASPR) 2–406.4 (advertised); 3–510 (negotiated); *accord,* FPR 1–2.-406–4 (advertised); 1–3.104 (negotiated). *Id.* The two DAR's are now on reserved status. 4 CCH Gov't Contracts Rptr. ¶¶ 32,584.15 and 32,772. *See generally, The Comptroller General of the United States: The Broad Power to Settle and Adjust All Claims and Accounts,* 70 Harv.L.Rev. 350 (1956).

**5.** The Act only applies to contracts entered into by executive agencies either for procurement or the disposal of personal property. § 602.

timely commenced as authorized by this chapter." § 605(b). "A contracting officer shall issue a decision on any submitted claim of $50,000 or less within sixty days from his receipt of a written request from the contractor that a decision be rendered within that period." § 605(c)(1). If the contractor fails to request that the contracting officer issue his decision within sixty days, the contracting officer then has a "reasonable time" within which to render a decision. § 605(c)(3). "Any failure by the contracting officer to issue a decision within the period required will be deemed to be a decision by the contracting officer denying the claim and will authorize the commencement of the appeal or suit on the claim as otherwise provided in this chapter." § 605(c)(5).

Once the contracting officer issues his decision, or is deemed to have done so, the contractor has the option of appealing to an agency board of contract appeals, § 606, or "bring[ing] an action directly on the claim in the United States Court of Claims," § 609(a)(1). Decisions of agency boards are appealable, in turn, to the United States Court of Claims under the familiar Wunderlich standard of review. Compare 41 U.S.C. §§ 321, 322 (1976) with 41 U.S.C. § 609(b) (Supp. II 1978).

D. Facts. On September 29, 1978, plaintiff (Paragon), a mechanical contracting company, was awarded a construction contract by the Army Corps of Engineers. The contract was awarded pursuant to competitive bidding. Paragon's bid was $214,800; the next lowest bid was $249,300.

Plaintiff alleges that subsequent to entering into the contract, it discovered that it had made a unilateral clerical error in the calculations upon which its bid for the contract had been based. As a result of the error, Paragon's bid was $30,474 lower than what Paragon would have bid had it added correctly its projected costs under the contract. Note that Paragon would still have been the low bidder even had it added correctly.

On January 11, 1979, plaintiff wrote the contracting officer requesting, pursuant to DAR(ASPR) 17–000 et seq., i. e., Public Law 85–804, a price adjustment to the contract in order to correct for the clerical mistake in the calculation of its costs on the project. Paragon stated in its letter that "[the] mistake is substantial and the discrepancy between its bid and the next lowest bidder's bid on the project should have put the Contracting Officer on notice that Paragon Mechanical, Inc. may have made a significant error in calculating its costs on this project."

On August 3, 1979, the contracting officer wrote plaintiff, enclosing the Findings and Determination of the Deputy Chief of Engineers—the appropriate official to render a decision respecting Paragon's claim under DAR(ASPR) 17–000 et seq.—denying the submitted claim. The stated ground for denial was an alleged lack of clear and convincing evidence on the face of the bid to place the contracting officer on notice that an error had been made, as well as an alleged lack of overriding national defense interest in granting a price adjustment.

On September 3, 1979, Paragon's attorney wrote the contracting officer seeking clarification whether the contracting officer had adopted the Findings and Determination of the Deputy Chief of Engineers as his own. The letter continued: "In particular, have you, as Contracting Officer on this particular project, rendered a final decision with regard to Paragon Mechanical's request for contract reformation." This letter indicated that Paragon wished to pursue the appeals routes made available by the Contract Disputes Act of 1978 and that the prerequisite for doing so is a final "decision" on the contract claim by a contracting officer.

On October 29, 1979, the contracting officer responded to Paragon's attorney. The contracting officer indicated that it was his determination that Paragon was "not entitled to a . . . final decision in this matter" for two separate reasons.

First, "Paragon's 'claim' . . . even taken in its most favorable light, consists at best of a request for relief from the adverse financial consequences of Paragon's unilat-

*eral* mistake in bidding the subject contract, discovered after contract award, and, as such, does not entitle your client to reformation of the subject contract, pursuant to basic tenets of contract law, since Paragon does not allege any fraudulent or inequitable conduct on the part of the Government which induced or contributed to this unilateral mistake."

Second, Paragon had "waived any right it may have had to pursue its claim in this manner by electing to first present its claim as a request for extraordinary contractual relief under Public Law 85–804."

Rather than appeal to an agency board, Paragon filed a direct action in this court on March 4, 1980 pursuant to the authorization contained in the Contract Disputes Act. Paragon seeks, in the alternative, a price adjustment based upon established legal, *i. e.,* equitable, principles—in other words, contract reformation—or reversal of the denial of its unilateral bid mistake claim under Public Law 85–804. *See Paragon Energy Corp. v. United States,* Ct.Cl. No. 98–80C (order of Nov. 14, 1980).

## II. Analysis

■ The Government argues vigorously that plaintiff has failed to state a claim for judicial relief under the Contract Disputes Act. The Government correctly notes that in order to invoke the jurisdiction of this court under the direct access section of the Contract Disputes Act—§ 609(a)(1)—there

must first be a "decision" (or failure to decide) by the contracting officer. The contracting officer clearly did render some sort of decision in his letter of October 29, 1979.[6] The Act, however, denies the contracting officer the authority to issue a decision at the instance of a contractor until a contract "claim" in writing has been properly submitted to him for a decision. § 605(a). Absent this "claim", no "decision" is possible—and, hence, no basis for jurisdiction in this court. The parties essentially dispute whether such a "claim" has been submitted. Our brief answer is yes. In the following, we analyze the various dimensions of the problem.[7]

■ A. *Cognizable Contract Claims Under the Contract Disputes Act.* The threshold question is whether plaintiff has a cognizable claim within the provision authorizing the decision of a contracting officer, § 605(a). The statute provides that the authority of the contracting officer extends to "All claims by a contractor against the government relating to a contract." This language is obviously quite broad and, as a consequence, the Government takes refuge in certain legislative history in an attempt to urge a narrowing construction upon us. We agree that there are compelling indications that the statute should not be interpreted quite so broadly as its language at first blush would suggest. We cannot go so

---

**6.** If we accept the contracting officer's characterization that he was not in actuality rendering a decision, then his refusal to issue a decision within a reasonable time is deemed a constructive decision under the Contract Disputes Act. *See SCM Corp. v. United States,* Ct.Cl. No. 576–79C (order of Oct. 10, 1980).

**7.** Paragon entered into its contract with the Government on September 29, 1978. Its claim under the Contract Disputes Act was initiated on September 3, 1979. Section 16 of the Contract Disputes Act provides that the Act "shall apply to contracts entered into" on or after March 1, 1979. The section continues: "Notwithstanding any provision in a contract made before the effective date of the Act, the contractor may elect to proceed under this Act with respect to any claim pending then before the contracting officer or initiated thereafter." 92 Stat. 2391 (1978). In other words, the application of the Contract Disputes Act in the

present instance was not mandatory. It applies solely because of the contractor's election to this effect. We must respect this election and turn to consideration of the question whether the various jurisdictional prerequisites for bringing a direct action under the Contract Disputes Act in the Court of Claims have been satisfied. The issue is not academic. For instance, under the Contract Disputes Act, Paragon is eligible for interest upon amounts to which it is found entitled from the date upon which it first presented its claim to the contracting officer. § 611. In a reformation action bottomed upon this court's general Tucker Act jurisdiction—an option for contracts entered into prior to the effective date of the Contract Disputes Act—interest would not be payable. *See* 28 U.S.C. § 2516 (1976); *Bromley Contracting Co., Inc. v. United States,* 219 Ct.Cl. 517, 596 F.2d 448, 449–451 (1979).

far, however, to hold, as the Government wishes, that plaintiff is wholly without standing under this provision. Instead, we adopt an intermediate position. We find that Paragon's contract reformation claim, based upon the equitable principles recognized by this court, does constitute a valid, cognizable "claim" within § 605(a), but that its request for reconsideration of the Public Law 85–804 denial does not. This conclusion rests upon the following detail.

The Commission on Government Procurement was created by Public Law 91–129 in November 1969, 83 Stat. 269, to study and recommend to Congress methods "to promote [the] economy, efficiency, and effectiveness" of procurement by the executive branch of the Federal Government. This culminated in a lengthy report submitted by the Commission in 1972.[8] Among the problems identified by the Commission was the fragmentation of mechanisms for the resolution of claims in connection with Government contracts. 4 Report of the Commission on Government Procurement 15–16, 22 (1972).

Direct court access then existed for suits against the Government based upon a breach of contract. *See, e. g., United States v. Utah Construction & Mining Co.,* 384 U.S. 394, 404, 412, 86 S.Ct. 1545, 1551, 1555, 16 L.Ed.2d 642 (1966); *United States v. Anthony Grace & Sons, Inc.,* 384 U.S. 424, 430, 86 S.Ct. 1539, 1543, 16 L.Ed.2d 662 (1966). Direct court access also existed in contract reformation suits. *See, e. g., Timber Investors, Inc. v. United States,* 218 Ct.Cl. ——, 587 F.2d 472, 476 n.5 (1978); *Burnett Electronics Lab., Inc. v. United States,* 202 Ct.Cl. 463, 466, 479 F.2d 1329, 1330 (1973); *see also Universal Transistor Products Corp. v. United States,* 214 F.Supp. 486 (E.D.N.Y.1963). Procuring agencies had no jurisdiction over either type of claim. If the suit arose, however, from what was commonly called a contract "dispute", then, under the standard "disputes" clause, the contractor had first to exhaust administrative remedies by presenting its claim to a contracting officer

with subsequent review through an agency appeals board. Only after the contractor had presented its claim administratively could it bring the claim to the court for review. *See, e. g., United States v. Utah Construction & Mining Co.,* 384 U.S. 394, 401–402, 86 S.Ct. 1545, 1549–50, 16 L.Ed.2d 642 (1966); Kunzig, *Perspective: Government Contracts—Legal and Administrative Remedies,* 74 Mil.L.Rev. 1, 3 (1976). Contract "disputes" were defined as being redressable under some specific adjustment provision in the contract, *i. e.,* as "arising under" the contract. *See Utah Constr.,* 384 U.S. at 404–405 n.6, 86 S.Ct. at 1551 n.6. These "disputes" represented by far the most common type of contract litigation with the Government. 4 Report of the Commission on Government Procurement 15 (1972).

The needless complexity imposed by this system led the Commission on Government Procurement to make the following "Recommendation": "Empower contracting agencies to settle and pay, and administrative forums to decide, all claims or disputes arising under or growing out of or in connection with the administration or performance of contracts entered into by the United States." *Id.* at 22. The Commission further recommended that appeals to agency boards be made optional following an adverse decision by a contracting officer; instead, contractors should be allowed "direct access to the Court of Claims and district courts." *Id.* at 23. The consequence would be the processing of all contract claims, of whatever type, according to the same rules, with a pivotal role reserved to the contracting officer.

Both the House and Senate Reports accompanying the Contract Disputes Act of 1978 explicitly indicate that the new law was intended to implement the recommendations of the Commission on Government Procurement. H.R.Rep.No.95–1556, 95th Cong., 2d Sess. 6 (1978); S.Rep.No.95–1118, 95th Cong., 2d Sess. 1 (1978), *reprinted in* [1978] U.S.Code Cong. & Ad.News 5235. The recommendations concerning uniform

---

8. *See* Report of the Commission on Government Procurement (1972).

disputes resolving mechanisms were faithfully implemented *via* two separate provisions which appeared in both the House and Senate bills initially reported out of committee on September 26, 1978 and October 12, 1978, respectively. First, both bills provided in pertinent part that the authority of the contracting officer extended to "All contract claims submitted by a contractor against the Government." H.R.11002, 95th Cong., 2d Sess. § 5(a), 124 Cong.Rec. H 10725 (daily ed. Sept. 26, 1978); Cong.Rec. S 18635 (daily ed. Oct. 12, 1978). Second, both bills provided that each executive agency was "authorized to settle, compromise, pay, or otherwise adjust any claim by or against, or dispute with, a contractor relating to a contract entered into by it or another agency on its behalf, *including a claim or dispute initiated after award of a contract, based on* breach of contract, *mistake*, a misrepresentation, *or other cause for contract modification* or rescission." H.R.11002, § 4; S.3178, § 4(a) (emphasis supplied). Finally, both bills provided for direct court access following an adverse decision of a contracting officer upon a contractor's submitted claim. H.R.11002, § 11(a)(1), 124 Cong.Rec. H 10726 (daily ed. Sept. 26, 1978); S.3178, § 10(a)(1), 124 Cong. Rec. S 18637 (daily ed. Oct. 12, 1978).

The House Report explained the intent of § 4—the so-called "all disputes" clause—as follows:

The provisions of section 4 implement the Procurement Commission's recommendation that executive agencies be empowered, with very limited exceptions, to pay any claim or otherwise resolve any dispute growing out of or in connection with a Government contract. This language would end the distinction ... between claims arising under the contract, which may be adjudicated administratively on their merits, and those not specifically included under the disputes clause of the contract (*such as requests for reformation* or claims for breach of contract, on which adjudication can be obtained only in the courts). The committee has been advised that even experienced contractors occasionally choose the wrong forum, and this could cause delays and even the potential loss of a remedy.

In the course of hearings on the earlier bills, it was urged that this grant of authority to each executive agency to settle "all disputes" as provided in this bill would be beneficial. *It was asserted that there is no fundamental reason why* breach of contract, *mistake*, and misrepresentation *issues should not be settled administratively.* The "all disputes" approach provided in this section was urged on the basis that it will foster the desirable result of settling more meritorious claims and avoiding unnecessary disputes. It was also contemplated that, after a contracting officer's decision, this authority would eliminate the present fragmentation of remedies problems that may be present in some disputes—particularly those where there are both claims "under" the contract and those for "breach" of contract. This section will enable the agency boards of contract appeals to adjudicate all such appeals. This expansion of their jurisdiction is consistent with the statutory recognition given such boards in the bill. It is a recognition of their competence and ability to adjudicate matters beyond those "arising under the contract".

H.R.Rep.No.95–1556, 95th Cong., 2d Sess. 17–18 (1978); *accord*, S.Rep.No.95–1118, 95th Cong., 2d Sess. 19 (1978), *reprinted in* [1978] U.S.Code Cong. & Ad.News 5253 (emphasis supplied).

Whatever opposition to the "all disputes" clause was discernible, its focus was not upon the purposes of the clause—which commanded widespread support—but upon its language. In particular, Admiral Rickover, testifying at the Senate hearings, voiced concern "that the language might be construed as authorization for agencies to settle claims independent of their legal or contractual merits—so-called 'horse trade' settlements—which" technically could only be done "through resort to Public Law 85–804 with its safeguards including congressional review." S.Rep.No.95–1118, 95th Cong., 2d Sess. 5 (1978), *reprinted in* [1978]

U.S.Code Cong. & Ad.News 5239; *see Contract Disputes Act of 1978: Joint Hearings Before the Subcomm. on Federal Spending Practices and Open Gov't of the Comm. on Governmental Affairs and the Subcomm. on Citizens and Shareholders Rights and Remedies of the Comm. on the Judiciary, United States Senate*, 95th Cong., 2d Sess. 10, 24 (1978) (testimony of Adm. Hyman G. Rickover); *see also id.* at 154 (testimony of Paul G. Dembling) and 175 (testimony of Irving Jaffe).

The Senate Report strove to remove the loophole detected by Admiral Rickover by stating clearly that "it is not the intent of this section [the "all disputes" clause] to authorize Agency heads, contracting officers, or agency boards to settle or compromise claims independent of their legal or contractual merits, except as specifically authorized by other statutes such as Public Law 85–804." S.Rep.No.95–1118, 95th Cong., 2d Sess. 19 (1978), *reprinted in* [1978] U.S.Code Cong. & Ad.News 5253. Senator Proxmire, speaking on the Senate floor, stated: "The act does not deal with the set of problems that fall under Public Law 85–804. Public Law 85–804 provides for extra contractual relief to contractors. It is not, strictly speaking, a mechanism for resolving contract disputes." 124 Cong.Rec. S 18639 (daily ed. Oct. 12, 1978).

Shortly after Senator Proxmire's statement, Senator Byrd introduced a series of amendments designed to eliminate the potential trouble spot, without at the same time compromising any of the goals of the legislation. Section 4(a) of the Senate bill—the "all disputes" clause—was deleted. New language was added to § 8(d) providing that, "In exercising [its] jurisdiction, the agency board is authorized to grant any relief that would be available to a litigant asserting a contract claim in the Court of Claims." The amendments were agreed to. Senator Byrd explained the purpose of the amendments as follows:

> The amendments ... address the concerns expressed by [several Senate committees] that the Act not permit the Contracting Officer or the Agency Boards to grant the discretionary relief solely authorized by Public Law 85–804. The Act does not permit contracting officers or Agency Boards to grant such relief. Executive agency compromise and settlement authority is not addressed in this Act as this is a matter considered to be included in their existing procurement/acquisition authority under the established precedents. "All disputes" authority to eliminate the present problem whereby "breach" of contract cases cannot be resolved within the current disputes process is conferred to the executive agencies and the agency boards by the provisions in new Section 6(a) and 8(d) requiring all claims to be the subject of a Contracting Officer's decision and granting full jurisdiction in the Board of Contract Appeals to grant appropriate relief. The grant of authority to the agency boards in the amendment to section 8(d) is meant to supplement those situations where there is inadequate authority on the part of the contracting officer to fully resolve disputes. Agency boards will now have the same authority as the Court of Claims would have in contract cases under section 10(a), and will be in a position to hear the appeals of all contracting officers' decisions.

124 Cong.Rec. S 18639–18641 (daily ed. Oct. 12, 1978). The next day the language of the House bill was amended to contain the text of the Senate bill. 124 Cong.Rec. H 13317 (daily ed. Oct. 13, 1978). The House bill then became the enacted statute.

The Government argues that the deletion of the "all disputes" clause shows that Congress did not intend that contracting officers should have the authority under the Contract Disputes Act to modify a contract to mitigate the effect of a unilateral bid mistake. This argument, however, improperly fails to distinguish between contract "adjustment" under Public Law 85–804 and contract "reformation" under the equitable principles recognized by this court.

There is no question that Congress intended to exclude from the operation of the Contract Disputes Act the broadly discre-

tionary settlement authority conferred by laws such as Public Law 85–804. For this reason, we hold that a claim solely and directly based upon 85–804—such as plaintiff's appeal of the denial by the Deputy Chief of Engineers—is precluded from consideration under the Contract Disputes Act.

The singularity of contractual mistakes—unilateral and mutual—is that they have been remediable both under Public Law 85–804 ("adjustment") and under the equitable principles recognized by this court ("reformation"). The Government asserts, in effect, that since unilateral bid mistakes have been remediable under Public Law 85–804, they fall by implication under the 85–804 "taint", irrespective of the fact that there has been a perfectly valid basis for remedying them independently of 85–804. We cannot find any merit to this view insofar as the separate legal basis is relied upon.

Congress could not have expressed itself more clearly to the effect that all contractor claims based upon a valid contractual theory fall within the procuring agencies' jurisdiction under the Contract Disputes Act. This was essential to Congress' design that all contract disputes be resolved according to the same set of procedures, beginning with the decision of the contracting officer. By implication—and also by express statement—equitable reformation to rectify bid mistakes is covered. There is no inconsistency here, because while procuring agencies will be affording a remedy previously available under 85–804, they will not be proceeding under the broadly discretionary "national defense" criterion of that law, but under the far more confining set of rules and principles which this court has evolved over a long string of reformation cases. Under these circumstances, the 85–804 "taint" is simply irrelevant.

DAR(ASPR) 1–314(f), 4 CCH Gov't Contracts Rptr. ¶ 32,072, revised in light of the Contract Disputes Act, states that, "Requests for relief under Public Law 85–804 are not considered to be claims within the

Contract Disputes Act.... However, certain kinds of relief formerly available only under Public Law 85–804, i. e., legal entitlement to rescission or reformation for mutual mistake, are now available within the authority of the contracting officer under the Act.... A contractor's allegation that it is entitled to rescission or reformation of its contract in order to correct or mitigate the effect of a mistake shall be treated as a claim under the Contract Disputes Act.... A contract may be reformed or rescinded by the contracting officer if the contractor would be entitled to such remedy or relief under the law of Federal contracts." *Accord*, FPR 1–1.318–2, 7 CCH Gov't Contracts Rptr. ¶ 66,046.

This court has stated that agency boards of contract appeals have authority under the Contract Disputes Act to grant equitable reformation. *Applied Devices Corp. v. United States*, 219 Ct.Cl. 109, 591 F.2d 635, 640 (1979). *See also Bromley Contracting Co., Inc. v. United States*, 219 Ct.Cl. 517, 596 F.2d 448, 449–451 (1979). The Armed Services Board of Contract Appeals recently held that, "It is too clear to require citation of authority that contracting officers and boards of contract appeals have authority under the Contract Disputes Act to decide breach and reformation claims notwithstanding the fact that prior to the Act some such claims were cognizable within the executive departments only as extraordinary relief claims under P.L. 85–804." *Gentex Corp.*, 79–2 BCA 68,777, 68,779 (1979). *Accord, Sperry Rand Corp., Sperry Univac Div.*, Dept. of Transp. Contract Adj.Bd. No. 85–804–14 (December 23, 1980).

■ We thus hold that procuring agencies have authority under the Contract Disputes Act to reform contracts (and award proper monetary relief) to mitigate the effect of a unilateral bid mistake. A reformation claim for this purpose is cognizable before the contracting officer (and, by extension, agency boards of contract appeals).[9]

---

9. The *receipt* of a negative decision under Public Law 85–804, as here, does not preclude the later initiation of a claim under the Contract Disputes Act. *See Embassy Moving & Storage*

*Co. v. United States*, 191 Ct.Cl. 537, 545, 424 F.2d 602, 607 (1970). *See also Gentex Corp.*, 79–2 BCA 69,569, 69,573 (1979).

■ B. *The Proper Submission of a Contract Claim Under the Contract Disputes Act.* Having determined that Paragon did have a cognizable contract claim against the Government, we must next address the question whether a written claim was properly "submitted to the contracting officer for a decision," also required by § 605(a). We believe so.

The question turns upon the interpretation to be placed upon the letter written by Paragon's attorney to the contracting officer on September 3, 1979. Prior to that time, Paragon had not in any way invoked the Contract Disputes Act in its correspondence with the Government. The September 3 letter apparently had two objectives. First, Paragon sought reconsideration of the Deputy Chief of Engineers' denial of its Public Law 85-804 claim: not a cognizable claim, as we have indicated. Second, the letter expressed Paragon's interest in a "final decision" with regard to its "request for contract reformation." The letter also indicated that Paragon sought that decision so that it would be free to pursue its appeals routes under the Contract Disputes Act, if necessary. While the letter can hardly be termed a model, we believe that it adequately sets forth a claim for contract reformation under the Contract Disputes Act. We note that the contracting officer's subsequent denial was premised in part upon "basic tenets of contract law," proof that he was not at all confused as to the nature of what was being requested.

DAR(ASPR) 1-314(b)(1) defines "claim" for purposes of the Contract Disputes Act as follows: "As used herein, 'claim' means a written demand on one of the contracting parties seeking, as a matter of right, the payment of money, adjustment or interpretation of contract terms or other relief arising under or related to the contract." In view of our foregoing analysis, there can be no doubt that Paragon's September 3 letter satisfies this test.

Since a contract "claim" was properly submitted to the contracting officer for decision, and that "decision" has "issued", this court now has jurisdiction to entertain Paragon's direct action under the Contract Disputes Act.

## III. CONCLUSION

All other arguments raised by the Government, although not directly addressed in this opinion, have been considered and found to be without merit.

Accordingly, after consideration of the submissions of the parties, with oral argument of counsel, defendant's motion to dismiss is denied. This cause is remanded to the trial judge for further appropriate proceedings respecting Paragon's claim for equitable reformation under the Contract Disputes Act.