In re **REMINGTON RAND CORPORA-TION, Remington Rand Corporation (New Jersey), Debtors.**

The **KILBARR CORPORATION** and **Pennbarr Corporation, Plaintiffs–Appellants,**

v.

**GENERAL SERVICES ADMINISTRA-TION, OFFICE OF FEDERAL SUP-PLY AND SERVICES, Defendant–Appellee.**

No. 87–5063.

United States Court of Appeals, Third Circuit.

Argued Oct. 5, 1987.

Decided Jan. 6, 1988.

Joseph A. Dworetsky (argued), Suzanne Coyle, Drinker Biddle & Reath, Philadelphia, Pa., for plaintiffs-appellants.

Samuel A. Alito, Jr., U.S. Atty., Jerome L. Merin (argued), Asst. U.S. Atty., Newark, N.J., for defendant-appellee.

Before BECKER, SCIRICA and ROSENN, Circuit Judges.

## OPINION OF THE COURT

SCIRICA, Circuit Judge.

This appeal requires us to examine the interplay between provisions of two divergent Acts of Congress: the Bankruptcy Reform Act of 1978 ("the Code"), 11 U.S.C. §§ 101(4)(A), 1141(d)(1)(A) (1982), and the Contract Dispute Act of 1978 ("the Act"), 41 U.S.C. § 605(a) (1982). Our inquiry must focus on each statute's use of the term "claim." Specifically, we must reconcile the Act's framework for processing government contract claims with the Code's broad treatment of "claim" for purposes of a bankruptcy discharge.

At issue is whether the government has a claim under § 101(4)(A) of the Code prior to confirmation of a debtor's Chapter 11 reorganization plan when: (1) the government had not completed the final audit of its dealings with the debtor; and (2) pursuant to § 605(a) of the Act, a federal contract officer had not certified the validity of the government's claim. If we conclude that a claim existed, we must then decide whether the government should be permitted to file a late proof of claim when the debtor, appellant Remington Rand Corp., acknowledges its failure to properly notify the government of the deadline for asserting claims affected by the Chapter 11 reorganization. Here, the government first sought to assert its claim nearly four years after the plan's confirmation.

Resolution of the "claim" issue is critical to the government's right to relief. If we conclude that the claim arose before confirmation of the Chapter 11 plan, then the claim is considered discharged and, barring permission to file a late proof of claim, the government will be estopped from seeking recovery from the reorganized Remington Corp. 11 U.S.C. § 1141(d)(1)(A).[1]

Because these two statutes touch upon the same subject, we must, absent congressional intent to the contrary, give effect to both if they are capable of co-existence. *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1018, 104 S.Ct. 2862, 2881, 81 L.Ed.2d 815 (1984); *Morton v. Mancari*, 417 U.S. 535, 551, 94 S.Ct. 2474, 2483, 41 L.Ed.2d 290 (1974). Finding no intention by Congress to the contrary, we deem the statutes capable of co-existence. Therefore, our decision must effectuate both provisions.

In the Code, Congress defined "claim" in the broadest possible terms as any unliquidated, contingent, unmatured or disputed rights to payment. *See* 11 U.S.C. § 101(4)(A); *In re Frenville*, 744 F.2d 332, 336 (3d Cir.1984), *cert. denied*, 469 U.S. 1160, 105 S.Ct. 911, 83 L.Ed.2d 925 (1985). In the Act, "claim" is undefined, but the term is used to signify the more traditional legal cause of action. *See Joseph Morton Co. Inc. v. U.S.*, 757 F.2d 1273, 1279–81 (Fed.Cir.1985); *see generally* 41 U.S.C. §§ 605, 612. Thus, in drafting the Code to reach nearly every type of claim, Congress necessarily included the more traditional type of claim contemplated in the Act. Moreover, the certification procedure in § 605(a) of the Act does not create a claim; it merely creates a jurisdictional prerequisite to judicial resolution of existing claims.

---

1. We recognize that the definition of "claim" applies equally to a liquidation proceeding under Chapter 7. In a Chapter 7 proceeding, claims not paid pursuant to distribution of a liquidated estate, *see* 11 U.S.C. § 726, are discharged and the debtor is given a fresh start. *See id.* § 727. Chapter 7 discharge, however, applies only to individuals and does not apply to corporations. *Id.;* 4 *Collier on Bankruptcy* § 727.01, at 727–5 to 727–9 (L. King ed. 1987). Thus, a future claimant, or a party asserting a valid late claim against a corporation liquidated under Chapter 7, will be left with a claim against a corporate shell. Under Chapter 11, however, that claimant could seek payment from the reorganized debtor. Because this appeal involves only a Chapter 11 dispute, we limit our holding accordingly.

Applying the Act without regard to these facts would require us to treat government claims differently from all other Code claims, and also would allow the government to control the timing of when its bankruptcy claims arise. We find no indication that Congress intended this anomalous result. Absent direction from Congress exempting government claims from the general Code definition, we are unwilling and constitutionally unable to assume this legislative function.

■ Accordingly, we reverse the district court and hold that in a Chapter 11 proceeding, the two statutes are best effectuated by requiring the government to assert its claims—even those not yet authorized pursuant to the Act—when an officer in authority has knowledge of them before confirmation of a reorganization plan. Here, the government's contingent and unliquidated contract claim, stemming from breaches in 1980 and 1981, and discovered five months before confirmation of Remington's Chapter 11 reorganization plan, fell within the Code's broad definition of "claim." Although the claim was not certified pursuant to the Act until April 29, 1985, the government's right to payment existed before the plan's December 24, 1981 confirmation, and the government had the requisite knowledge of its right to payment before that date as well.

In addition, we hold that the bankruptcy court improperly granted summary judgment on the government's request to file a late proof of claim where Remington failed to notify the government of the claims bar date. We shall remand for a determination whether the government acted promptly and diligently in ultimately seeking relief.

## I. FACTS AND PROCEEDINGS BELOW

Beginning in October, 1979, Remington contracted with the General Services Administration Office of Federal Supply and Service [hereinafter "GSA" or "the government"] to supply typewriters and typewriter elements. Under the government's Multiple Award Schedule Program, GSA contracts for supplies with various vendors, such as Remington, and then publishes each item and its price in a catalog from which all federal agencies order supplies. The parties entered two contracts: one covering 1980 and another 1981, terminating September 30, 1981. Both contracts included a "most favored nation" clause guaranteeing the government a price equal to the lowest of any Remington customer.

On March 28, 1981, Remington filed a voluntary petition for reorganization under Chapter 11. Less than a month later, government auditors began a "pre-award audit" of the 1980 and 1981 contracts to assist GSA in negotiating Remington's proposed 1982 contract. This audit was intended to evaluate the data submitted in Remington's proposed 1982 contract by examining the cost and sales submitted in support of Remington's bid. Government auditors spent about 300 hours on the audit, completing the project in June, 1981. They released their findings July 6, 1981, concluding that the proposed 1982 contract bid was generally acceptable. The auditors noted, however, that although the company's records were incomplete, Remington had provided other customers with discounts not granted to GSA. See App. at 161–62. Remington's failure to pass these discounts along to GSA was a breach of the 1980 and 1981 contracts, which had guaranteed GSA's receipt of Remington's most favorable rates.

The findings of possible contract irregularities prompted auditors to launch a more detailed post-award audit in June 1981. Post-award audits are normally undertaken during or after the contract period and are specifically designed to determine whether the contractor adhered to the most favored nation clause. Field work for the post-award audit was completed for the most part in September, 1981. The auditors released a draft of their final report in February, 1982, and the actual report in May, 1982, concluding that Remington owed GSA $394,773 for breaching the most favored nation clause.

Pursuant to bankruptcy rules, Remington had notified its creditors to file proof of claims before October 26, 1981, the date for

court approval of its disclosure statement. GSA, however, was neither notified[2] nor listed as a creditor on Remington's filed schedules with the bankruptcy court and therefore did not file proof of its claim before that date. The court confirmed Remington's plan of reorganization December 24, 1981. In the meantime, GSA did nothing to pursue its claim in the bankruptcy court.

When GSA attempted to assert its $394,-773 post-award audit claim, Remington contended that the claim had been discharged in the Chapter 11 proceeding. In October, 1982, GSA's inspector general sought legal advice from the Justice Department concerning the possibility of recovery. The United States Attorneys Office for the District of New Jersey then referred the case back to GSA with instructions to first obtain approval of the claim from a government contract officer, as required under the Act. On April 29, 1985, nearly three years later, the government's contract officer authorized GSA's claim.

Remington filed suit in the bankruptcy court July 29, 1985 seeking a declaratory judgment and injunctive relief to prohibit GSA from collecting the $394,773. The bankruptcy judge held that no claim arose until completion of the post-award audit and release of the audit report in 1982—after the Chapter 11 confirmation. Moreover, the court concluded, even if GSA's claim arose before confirmation of the plan, GSA should be entitled to file a late proof of claim. The district court affirmed, holding that the Act governed when the government's claim arose, and that the government had no right to payment until completion of the post-award audit. The district court, however, did not address the late proof of claim issue.

## II. DISCUSSION

On appeal, Remington contests the district court's affirmance of the bankruptcy court's determination that the government's claim did not arise before confirma-

tion of the Chapter 11 plan. Because we must examine the interpretation and application of a legal precept, our review is plenary. *In re McKeesport Steel Casting Co.*, 799 F.2d 91, 93 (3d Cir.1986) (citing *Universal Minerals, Inc. v. C.A. Hughes & Co.*, 669 F.2d 98, 101–02 (3d Cir.1981)).

Remington contends that the government's claim arose at the time of three different contractual breaches in: July through November, 1980; August, 1980; and January through February, 1981. At this point, Remington maintains, "not only had the breaches occurred, but all the damages were suffered, prior to the date of confirmation." Brief of Appellants, at 19. The bankruptcy court and district court erred, Remington argues, by focusing on when the cause of action accrued, as opposed to when the claim arose.

The government advocates a bright line rule, focusing on application of § 6(a) of the Act. Under this approach, no right of payment exists, *i.e.*, no claim arises, until a contracting officer first determines that a valid claim exists. *See* 41 U.S.C. § 605(a). Thus, the government argues, it did not possess a bankruptcy claim until April, 1985—nearly five years after the first breach; four years after the pre-award audit and the Chapter 11 confirmation, and three years after the post-award audit.

In an attempt to reconcile these two conflicting approaches, the bankruptcy court and the district court relied on the Act and held that the government's right to payment arose when the post-award audit was completed. Their conclusion was based on the reasoning of the Medicare overpayment cases, which noted that the government's claim for statute of limitations purposes arises upon completion of a post-award audit, *i.e.*, when the government knew or should have known facts material to the cause of action, not when the alleged overpayments were made. *See, e.g., United States v. Pisani*, 646 F.2d 83, 89 (3d Cir. 1981); *United States v. Withrow*, 593 F.2d 802, 804 (7th Cir.1979).

2. In its July 6, 1981 pre-award audit report, the government acknowledged that during the audit process, Remington had unofficially informed auditors in April, 1981 of the company's pending Chapter 11 petition.

Thus, without the benefit of congressional guidance, the bankruptcy court and the district court were confronted with a difficult case governed by seemingly inconsistent statutory mandates. We decline, however, to adopt the same reasoning. Both courts failed to give effect to the Code's broad definition of "claim," and their reliance on Medicare statute of limitations cases was misplaced. First, those decisions were made in the context of when a traditional "right of action" accrues. *See Pisani*, 646 F.2d at 89; *Withrow*, 593 F.2d at 804 (citing 28 U.S.C. § 2415(a)). Second, in the Medicare context, post-award audits are mandatory and performed by outside contractors. *See Pisani*, 646 F.2d at 84; *Withrow*, 593 F.2d at 804. Thus, in Medicare cases, the government does not learn of any possible claim until the audit's completion. Here, however, the post-award audit was performed by government auditors at their option and initiated only because their pre-award audit revealed an apparent breach of contract. Moreover, the same contracting officer who was responsible for determining a claim existed on the 1980–81 contract received the information about a possible breach from the 1982–83 pre-award audit.

We also decline to adopt the rationale advocated by the parties. Remington's position ignores the government's obligations under the Act and the unique nationwide "catalog-type" purchasing system that government auditors must review before assessing the existence of a possible claim. The government's theory, meanwhile, focuses exclusively on the Act's authorization requirement in complete disregard of the Code.

### A. The Code

In reconciling these provisions, we begin, as we must with the statutory language. *Kelly v. Robinson*, —— U.S. ——, 107 S.Ct. 353, 358, 93 L.Ed.2d 216 (1986). Section 1141(d)(1)(A) of the Code discharges a debtor from debts that arise before confirmation of a reorganization plan. The Code defines "debt" as "liability on a claim," *id.* § 101(11), and "claim" as a:

(A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, dispute, undisputed, legal, equitable, secured, or unsecured; or

(B) right to an equitable remedy for breach of of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured;

*Id.* § 101(4).

By defining claim in these terms, Congress opted for an expansive treatment, thereby eliminating the "provability and allowability" requirements of the Bankruptcy Act of 1898. *In re Johns–Manville Corp.*, 57 B.R. 680, 686 (Bankr.S.D.N.Y. 1986). Indeed, Congress unambiguously stated its intent to address all possible legal obligations in defining a bankruptcy claim:

The effect of the definition is a significant departure from present law.... The definition is any right to payment whether or not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured.... By this *broadest possible definition* and by use of the term throughout the title 11, especially in subchapter I of chapter 5, the bill contemplates that all legal obligations of the debtor, no matter how remote or contingent, will be able to be dealt with in the bankruptcy case. It permits the broadest possible relief in the bankruptcy court.

H.R.Rep. No. 595, 95th Cong., 2d Sess. 309, *reprinted in* 1978 U.S.Code Cong. & Ad. News 5963, 6266 (emphasis added); S.Rep. No. 989, 95th Cong., 2d Sess. 21–22, *reprinted in* 1978 U.S.Code Cong. & Ad. News 5787, 5807–08 (emphasis added). We recently recognized the far-reaching scope of this definition. *See In re Frenville*, 744 F.2d at 336; *accord Ohio v. Kovacs*, 469 U.S. 274, 279, 105 S.Ct. 705, 708, 83 L.Ed.2d 649 (1985); *In re Robinson*, 776 F.2d 30, 35 (2d Cir.1985) (collecting cases), *rev'd on*

*other grounds, Kelly v. Robinson,* — U.S. ——, 107 S.Ct. 353, 93 L.Ed.2d 216 (1986).

As this court stated in *In re Frenville,* the existence of a valid claim depends on: (1) whether the claimant possessed a right to payment; and (2) when that right arose. *In re Frenville,* 744 F.2d at 336. For example, an indemnity or surety agreement creates a right to payment, albeit contingent, between the contracting parties immediately upon the signing of the agreement. *Id.* at 336. In *Frenville,* however, we held that a third-party's indemnity or contribution claim did not arise before the bankruptcy petition because, under state law, third-parties do not possess any rights until the contracting parties first establish a primary obligation to pay. *Id.* at 337.[3]

Although we determined that state law governed the right to payment inquiry in *Frenville,* we acknowledged that in some cases, overriding federal policy would require us to consult federal law. *Id.* at 337 & n. 8; *accord Vanston Bondholders Protective Committee v. Green,* 329 U.S. 156, 161, 67 S.Ct. 237, 239, 91 L.Ed. 162 (1946); *Schweitzer v. Consolidated Rail Corp.,* 758 F.2d 936, 941 (3d Cir.), *cert. denied sub nom., Reading Co. v. Schweitzer,* 474 U.S. 864, 106 S.Ct. 183, 88 L.Ed.2d 152 (1985); *In re Altair Airlines, Inc.,* 727 F.2d 88, 90 (3d Cir.1984). Reference to non-bankruptcy law is critical: unless state or federal law independently creates obligations, the bankruptcy court is not presented with a claim to either recognize or reject. *See Vanston,* 329 U.S. at 170, 67 S.Ct. at 243 (Frankfurter, J., concurring); *In re Penn Central Transp. Co.,* 771 F.2d 762, 766 (3d Cir.), *cert. denied sub nom., Pinney Dock*

*& Transp. Co. v. Penn Central Transp. Co.,* 474 U.S. 1033, 106 S.Ct. 596, 88 L.Ed. 2d 576 (1985); *In re Frenville,* 744 F.2d at 337. State law applies, however, unless federal law "creates substantive obligations" wholly apart from bankruptcy. *See Schweitzer,* 758 F.2d at 941 (citing *Vanston,* 329 U.S. at 170, 67 S.Ct. at 243 (Frankfurter, J., concurring)).

## B. The Act

■ We turn first to federal law, where the Act "applies to any express or implied contract ... entered into by an executive agency for ... (1) the procurement of property ... [or] (2) the procurement of services...." 41 U.S.C. § 602(a). In such cases, the Act provides, "all claims by the government against a contractor relating to a contract shall be the subject of a decision by the contracting officer." *Id.* § 605(a). Thus, a contract officer's determination that the claim is valid operates as a jurisdictional prerequisite to judicial resolution of the dispute.

Although the Act does not define "claim," the applicable federal regulations define it as a "written demand on one of the contracting parties seeking, as a matter of right, the payment of money, adjustment or interpretation of contract terms or other relief arising under or related to the contract." *Paragon Energy Corp. v. United States,* 645 F.2d 966, 976, 227 Ct.Cl. 176 (1981) (citing DAR(ASPR) 1–314(b)(1), 4 CCH Gov't Contracts Rptr. ¶ 32,072).[4]

Our examination of the statutory language reveals that Congress used "claim" in the traditional sense—as a legal cause of action.[5] For example, in § 605(a), the Act

---

3. *But see In re Baldwin–United Corp. Litigation,* 765 F.2d 343, 348 n. 4 (2d Cir.1985) (questioning *Frenville* holding).

4. The regulation further provides: "However, a written demand by the contractor seeking the payment of money in excess of $50,000 is not a claim unless or until certified [by a contracting officer]...." *See* 4 CCH Gov't Contracts Rptr. ¶ 32,072.
   To the extent this language may support the government's position, we find that the $50,000 limit is merely another jurisdictional prerequisite for eventually initiating suit in the Court of Claims. *See Contract Cleaning Maintenance,*

*Inc. v. United States,* 811 F.2d 586, 590 (Fed.Cir. 1987). Moreover, the regulation goes beyond the language of Act and is inconsistent with Congress' broad treatment of bankruptcy claims.

5. Existence of a "cause of action" helps courts determine when a litigant possesses a claim ripe for adjudication and whether the suit was filed within the applicable statute of limitations. *Compare Black's Law Dictionary* 201 (5th ed. 1979) (cause of action defined as "the fact or facts which give a person a right to judicial relief ... [or] to institute judicial proceedings") *with* 11 U.S.C. § 101(4)(a) (bankruptcy claim

bars agency officials from settling, compromising, or paying claims. In § 605(c), the Act sets forth a procedure for dealing with claims exceeding $50,000, and an expedited procedure for small claims. *See also* S.Rep. No. 1118, 95th Cong. 6, *reprinted in*, 1978 U.S. Code Cong. & Ad.News 5235, 5240. That provision further provides that a contract officer's failure to act on a claim in a reasonable time, or within the limits prescribed by the Act, will be deemed a denial of the claim, thereby permitting the claimant to file suit. In addition, the Act sets forth rules requiring prompt payment of judgments entered on any claim. *See* § 612. Finally, suits under the Act usually involve "claims" in the traditional sense, such as counterclaims, *see Joseph Morton Co.*, 757 F.2d at 1279–81; *In re MacLeod Co., Inc.*, 67 B.R. 134 at 135, (Bankr.S.D. Ohio 1986), or common law contract disputes. *See Paragon Energy Corp.*, 645 F.2d at 967; *see generally Contract Cleaning Maintenance, Inc. v. United States*, 811 F.2d 586, 592 (Fed.Cir.1987) (contract officer must receive clear and unequivocal statement of the basis and amount of claim).

In light of the statutory language and the legislative history, we conclude that the Act creates no substantive contractual rights; rather, it assumes the existence of a traditional contractual cause of action. More importantly, the Act imposes the approval requirement of § 605(a) as a procedural device intended to promote resolution of government contract disputes before resort to judicial process. *See Joseph Morton Co.*, 757 F.2d at 1280. Indeed, the Senate report indicated that the Act was established to "help … induce resolution of more contract disputes by negotiation prior to litigation; … [and] provide alternate forums suitable to handle the different types of disputes…." S.Rep. No. 1118, 95th Cong. 1, *reprinted in*, 1978 U.S. Code Cong. & Ad.News 5235, 5235.

### C. Reconciling the Code and the Act

In holding that the government did not possess a claim under § 101(4) of the Code,

the bankruptcy court and the district court concluded that the Act, and not common law contract law, defined the rights of the parties. The district court observed that the government was estopped from initiating legal action on its claim until a contracting officer certified the claim pursuant to § 605(a). *See* App. at 525–26. Moreover, it held, the government's right to payment did not manifest itself until the May, 1982 completion of the post-award audit. *See* App. at 527–31 (district court); *accord id.* at 478–84 (bankruptcy court).

The district court seemed to hold that the Act determined when a right to payment exists. Relying on the Act and the decision in *Paragon Energy Corp.*, 645 F.2d 966, the district court found that the certification procedure of § 605 was a prerequisite to any claim. Yet, apparently recognizing the inequity of allowing the government to wait nearly five years before asserting a claim, the district court ultimately abandoned its reliance on the Act by finding that the claim arose upon completion of the post-award audit rather than after certification of the claim by the contracting officer. Although the Act does not suggest this result, the district court affirmed the bankruptcy court's holding that the claim arose upon completion of the post-award audit.

By looking to completion of the audit process, both courts implicitly recognized the need to look beyond the Act and consult contract principles in determining the existence of a claim under the Code. Because the Act establishes procedures to resolve existing causes of action and does not create substantive rights, we hold that the district court erred to the extent it relied on the Act to determine the existence of a bankruptcy claim. In addition, we conclude that the courts erred by determining that completion of the post-award audit triggered the government's claim.

■ In ascertaining when the government's right to payment arose, we recog-

---

broadly defined as any right to payment, even if contingent, unmatured, unliquidated, or dis-

puted).

nize that a party may have a bankruptcy claim and not possess a cause of action on that claim. *See Schweitzer*, 758 F.2d at 942 (citing *In re Radio–Keith–Orpheum Corp.*, 106 F.2d 22, 26–27 (2d Cir.1939)). To be sure, *Schweitzer* and *In re Radio–Keith* discussed this principle in the context of a more clearly established right to payment. In *Schweitzer*, we concluded that an "as yet nonexistent" tort cause of action was not a claim for purposes of the Code. *Schweitzer*, 758 F.2d at 943. Nevertheless, we noted that a party who contracts with a debtor pre-bankruptcy should not be permitted to avoid the consequences of that legal relationship in the context of a bankruptcy proceeding. *Id.* Any interest cognizable under the Code, however, must stem from "a legal relationship relevant to the purported interest from which that interest may flow." *Id.* at 943 (citing *In re Frenville*, 744 F.2d 332). For example, in *In re Radio–Keith*, the parties cognizable interest was a debtor's rent guaranty enabling one of its subsidiaries to lease property. *In re Radio–Keith*, 106 F.2d at 26–27.

Although recognizing these principles, the district court nevertheless concluded that "no legal relationship developed which would require that the Government assert any claim it might have against Remington at the time it filed its bankruptcy petition in 1981." App. at 530. We disagree.

As a threshold matter, Remington's breaches occurred in July through November, 1980; August, 1980; and January through February, 1981. Although not dispositive, each underlying wrong occurred well before the December, 1981 confirmation of the Chapter 11 plan. We recognize that in the context of the government's

nationwide catalog-type purchasing system, it would have been virtually impossible for the government to learn of these breaches without the benefit of an in-depth audit.

Here, however, the government initiated such an audit. Beginning in April, 1981, government auditors embarked on a 300-hour pre-award audit to examine costs and sales figures submitted by Remington in support of a proposed 1982 contract. In the course of this investigation, the government uncovered evidence that Remington had breached favorable pricing provisions by not passing along discounts granted to other customers. The July, 1981 pre-award audit report expressly acknowledged breaches, which if proven, would have resulted in favorable judgment.[6] The report also noted that "it was reported that" Remington had filed for Chapter 11 reorganization in April, 1981.

The government contends that the pre-award audit was not designed to determine possible breaches of the 1980 and 1981 contracts. This argument ignores the obvious. Although the audit was not designed to uncover possible contract claims, it uncovered them nonetheless. Thus, the government cannot now say it was entitled to ignore the findings of its own auditors.

In addition, the results of this pre-award audit prompted government officials to launch a more comprehensive post-award audit in June, 1981—six months before the plan's December, 1981 confirmation. Although the final post-award audit was not released until two months after the confirmation, field work for the post-award audit was completed in September, 1981. These factors, viewed as a whole, establish that the government knew it possessed a right to payment for breach of contract before

---

**6.** Although the report cautions that sales information could not be accurately verified and that discount data was incomplete, it notes that Remington failed to notify the government of promotional discounts, which it was required to do under the 1980 and 1981 contracts. Specifically, the report states:

Remington has stated that it grants dealers up to a 38% discount. This statement is substantially correct as shown in Appendix I. However, Remington did not disclose that in January and February, 1981, it granted dealers an

additional $50 reduction from list price. This $50 promotional discount increased dealer discount rates up to 43.9% during that time period. This is also shown in Appendix I. In addition to the above, we learned that Remington granted discounts up to 52.1% to one of its dealers....

....

Remington was unable to show us where it notified the Government of such discounts under present GSA Contract....

App. at 161–62.

December 24, 1981. That the government had not established the precise amount of its claim is immaterial. *See* 11 U.S.C. § 101(4)(a).

We are not unsympathetic to the government's difficulty in determining a breach when it must review a nationwide catalog purchasing system, and then compare its findings with a contractor's records of dealings with other customers. In this case, however, the auditors uncovered irregularities indicating a right to payment for contract breach in sufficient time to permit GSA to give notice of its claim to the bankruptcy court.[7] Accordingly, we shall not reward a subsequent lack of diligence by those responsible for asserting the government's claim.

### III. Filing a Late Proof of Claim

Resolution of the "claim" issue, however, does not end our inquiry. The bankruptcy court also concluded that the government should be permitted to file a late proof of claim. This determination was premature.

■ Remington acknowledges that it failed to provide the government, a known creditor, with proper notice of the bar date for claims under the plan. Accordingly, the government was entitled to request permission to file a late proof of claim. *City of New York v. New York, N.H. & H.R. Co.,* 344 U.S. 293, 297, 73 S.Ct. 299, 301, 97 L.Ed. 333 (1953); *In re Harbor Tank Storage,* 385 F.2d 111, 115–16 (3d Cir.1967). Upon receipt of such a request, however, the bankruptcy court must examine the totality of the circumstances before allowing a late filing.

■ Here, the bankruptcy court erred by granting this permission in the context of a summary judgment motion without first determining whether the government acted promptly and diligently. *See In re Pagan,* 59 B.R. 394, 396–97 (D.P.R.1986); *In re*

*Arnold Print Works, Inc.,* 47 B.R. 288, 290 (Bankr.D.Mass.1985); *In re Cmehil,* 43 B.R. 404, 408 (Bankr.N.D. Ohio 1984). Because finality is particularly important in bankruptcy proceedings, creditors cannot wait "indefinitely" before filing a proof of claim. *In re Arnold Print Works, Inc.,* 47 B.R. at 290.

The government first received official notification of the Chapter 11 proceedings in March and July, 1982, when Remington announced its position that the $394,773 claim had been discharged by confirmation of the plan in December, 1981. Moreover, the pre-award audit indicates that government auditors informally learned of the Chapter 11 proceeding as early as April, 1981. Nevertheless, the government waited until April, 1985 to assert its right to payment.

Although we are presented with the relevant dates, we are unable to decide on this record whether the government has any legal justification for requesting the filing of a late proof of claim. With fact-specific questions such as this, a sterile appellate record fails to tell the full story. Therefore, we believe that the bankruptcy judge, with the benefit of a fully developed record on this issue, is better suited to make such findings.

Based on the foregoing, we will vacate the judgment of the district court and remand for further proceedings consistent with this opinion.

7. In most cases, we anticipate that the government will not possess sufficient knowledge to assert a potential claim until completion of a post-award audit. Only then would the parties' "legal relationship," *see Schweitzer v. Consolidated Rail Corp.,* 758 F.2d 936, 943 (3d Cir.), *cert. denied sub nom., Reading Co. v. Schweitzer,* 474 U.S. 864, 106 S.Ct. 183, 88 L.Ed.2d 152

(1985), be such that the government would be in a position to determine and assert its right to payment. Indeed, the post-award audit is expressly designed to ascertain possible contract breaches. Therefore, the government's bankruptcy claim would likely not arise until that time.